# UNITED STATES of America,

v.

**Jeffrey NICHOLS, Defendant.**

**No. 95 Crim. 1060 (LAP).**

United States District Court,
S.D. New York.

May 31, 1996.

Michael A. Simons, Assistant United States Attorney, Mary Jo White, United States Attorney for the Southern District of New York, New York City, for U.S.

Paul J. Edelstein, Edelstein & Faegenburg, Brooklyn, New York, for Defendant.

## OPINION AND ORDER

PRESKA, District Judge:

Defendant Jeffrey Nichols has been charged by Criminal Information with violating the Child Support Recovery Act of 1992, 18 U.S.C. § 228, Pub.L. No. 102–521, § 2(a), 106 Stat. 3403 (October 25, 1992) ("CSRA"). Defendant now moves to dismiss the Information, arguing that CSRA exceeds Congressional authority under the Commerce Clause, that it violates the Tenth Amendment and the basic principles of federalism and comity, that it should be void for vagueness, and that it violates the Equal Protection Clause. Alternatively, the defendant argues that the abstention doctrine applies here and I should decline to decide this case.

After considering each of defendant's arguments and the government's opposition, I find that the CSRA is constitutional, and the motion is therefore denied.

## BACKGROUND

The essential facts of this case are not disputed. The Information charges that Nichols, from October of 1992 to August of 1995, "failed to pay a past due child support obligation, determined under a court order pursuant to the law of a State to be due from him for the support and maintenance of a child and that has remained unpaid for a period longer than one year and is greater than $5,000." Specifically, Nichols is charged with failing to pay over $500,000 in child support for three children living in New York while he lived in Florida and, currently, in Vermont.

The underlying complaint, filed on July 25, 1995, and the defendant's affirmation in support of this motion, elaborate on the circumstances leading to the Information. Defendant and his wife Marilyn Kane Nichols were married in 1969. The couple had three children. Their relationship deteriorated, however, to the point that May of 1990, Nichols was found in contempt by the Supreme Court of the State of New York for failing to pay $68,319 in previously court-ordered child support. In August of 1990, the state court granted Mrs. Nichols a divorce on the grounds of abandonment and awarded her custody of the children. Nichols, living out-of-state, did not appear for the trial. He was ordered to pay $9,362.82 per month in child support until the eldest child reached the age of twenty-one, then $8,071 until the second child reached the same age, then $5,488 until the youngest reached twenty-one.

None of this support had been paid by 1993, when Mrs. Nichols sought to enforce the New York judgment in Florida, where her ex-husband was residing. The state court in Florida found Nichols to be approximately $400,000 in arrears in his payment of child and spousal support. He was ordered to pay $8,071 in monthly child support and $1,814 per month towards arrears. In 1994, when no child support had been paid, Mrs. Nichols sought enforcement of the New York judgment in Vermont, where Nichols had moved. The state court in Vermont found that Nichols was over half-a-million dollars in arrears in child support payments as of December 12, 1994.

On August 8, 1995, pursuant to a warrant issued in the Southern District of New York as part of the present prosecution, Nichols was arrested in Vermont by agents of the F.B.I. and brought here. Released after posting a $500,000 bond, secured by $10,000 cash and his Vermont home, Nichols was then arrested by the New York County sheriff and brought before the state court, where his contempt citation was still outstanding. Nichols was jailed until he both paid the $68,319 in child support still due under the court's previous order and agreed to a plan for payment of the remaining arrears. On December 7, 1995, after entering a compre-

hensive settlement agreement with his former wife, Nichols was released.

The one-count Criminal Information now at issue was filed on December 12, 1995. Defendant was arraigned before a Magistrate Judge and first appeared before me on December 20, when he entered a plea of not guilty. The present motion followed.

## DISCUSSION

Section 228 of Title 18 reads in part [1]:

§ 228. Failure to pay legal child support obligations (a) Offense.—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b).... [T]he term "past due support obligation" means an amount—(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period longer than one year, or is greater than $5,000; ....

## I. The Commerce Clause Challenge

Defendant's strongest argument to dismiss the Information is that, in enacting the CSRA, Congress exceeded its authority under the Commerce Clause. In making this argument, he relies almost exclusively on the Supreme Court's recent decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The argument is not novel; since *Lopez,* no fewer than eleven district courts have addressed Commerce Clause challenges to the CSRA. Four of these challenges (two were companion cases) were successful: *United States v. Parker,* 911 F.Supp. 830 (E.D.Pa.1995); *United States v. Bailey,* 902 F.Supp. 727 (W.D.Tex. 1995); *United States v. Mussari,* 894 F.Supp. 1360 (D.Ariz.1995), *recon. denied,* 912 F.Supp. 1248 (1995); *United States v. Schroeder,* 894 F.Supp. 360 (D.Ariz.1995) (companion case to *Mussari* ), *recon. denied,* 912 F.Supp. 1240 (1995); eight failed: *United States v. Collins,* 921 F.Supp. 1028 (W.D.N.Y.1996); *United States v. Billy Ray Sims,* 95–Cr–125 (N.D.Ok. Feb. 22, 1996); *United States v. Kegel,* 916 F.Supp. 1233 (M.D.Fla.1996); *United States v. Wilson,* No. 4:95–MG–3026 (N.D.Ohio, Nov. 7, 1995) (slip op.); *United States v. Sage,* 906 F.Supp. 84 (D.Conn.1995); *United States v. Hopper,* 899 F.Supp. 389 (S.D.Ind.1995); *United States v. Murphy,* 893 F.Supp. 614 (W.D.Va.1995); *United States v. Hampshire,* 892 F.Supp. 1327 (D.Kan.1995).

The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Like the "living Constitution" of which it is a part, the history of the Commerce Clause reflects a complex and evolving relationship between the Federal and State governments, a relationship that is a hallmark of our system of government. *See generally, Gregory v. Ashcroft,* 501 U.S. 452, 457–59, 111 S.Ct. 2395, 2399–2400, 115 L.Ed.2d 410 (1991). As with other relationships of fundamental and enduring importance, Constitutional and otherwise, and by the design of the Framers of the Constitu-

---

1. The statute in its entirety reads:

§ 228. Failure to pay legal child support obligations (a) Offense.—Whoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished as provided in subsection (b). (b) Punishment.—The punishment for an offense under this section is—(1) in the case of a first offense under this section, a fine under this title, imprisonment for not more than 6 months, or both; and (2) in any other case, a fine under this title, imprisonment for not more than 2 years, or both. (c) Restitution.— Upon a conviction under this section, the court shall order restitution under section 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing. (d) Definitions.—As used in this section—(1) the term "past due support obligation" means an amount—(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period longer than one year, or is greater than $5,000; and (2) the term "State" includes the District of Columbia, and any other possession or territory of the United States. 18 U.S.C. § 228.

tion,[2] the Federal–State relationship defies a precise definition or formula, leaving courts and lawmakers with the benefit and the burden of constantly testing and reassessing its parameters under the changing pressures of our Nation's history.[3] *Lopez*, —— U.S. at ——–——, 115 S.Ct. at 1633–34. It is the very elasticity of the relationship which has allowed it to endure these pressures.

The expansive nature of Congress's power under the Commerce Clause was first recognized by the Supreme Court, through the voice of Chief Justice Marshall, in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Commerce power is "power to regulate ... to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." *Id.* at 196. The most immediate prescribed limitation lies in the language of the clause itself, which reaches only commerce "among the several States" and leaves the "exclusively internal commerce of a State" beyond Congress's regulatory grasp. *Id.* at 195.

What the Court in *Lopez* called the "modern era" of Commerce Clause jurisprudence began with *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). The cases which followed *Jones & Laughlin,* including *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942), and *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), greatly expanded Congress's Commerce Clause power, particularly in its ability to regulate even local activities so long as they had a sufficient impact on interstate commerce. *See New York v. United States,* 505 U.S. 144, 158, 112 S.Ct. 2408, 2419, 120 L.Ed.2d 120 (1992) ("As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power."). This doctrinal shift "reflected a view that earlier Commerce Clause cases artificially had constrained the authority of Congress to regulate interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1628.

The *Lopez* decision, relied on by defendant, has received great attention from courts, commentators, and hopeful defendants because, for the first time in the modern era, the Supreme Court struck down a law passed by Congress pursuant to its Commerce Clause powers, declaring the law an unconstitutional intrusion by the Federal government into a matter reserved to the State. *See United States v. All Assets of G.P.S. Automotive Corp.*, 66 F.3d 483, 499 (2d Cir.1995) (*Lopez* "revealed the Court's willingness to give serious and renewed thought to issues of federalism at the foundation of our constitutional system"). Defendant argues that a similar intrusion has occurred here. I disagree. *See United States v. Genao,* 79 F.3d 1333, 1337 (2d Cir.1996) ("Because we find the statute at issue here to be different from that at issue in *Lopez* in ways that make the rationale of that decision inapplicable, we reject [defendant's] Commerce Clause challenge." *see also Lopez,* —— U.S. at ——, 115 S.Ct. at 1634 (*Lopez* is a "necessary though limited holding") (Kennedy, J., concurring).

## A. The *Lopez* Decision

*Lopez* concerned the Gun–Free School Zones Act of 1990 ("School Zones Act"), in

---

**2.** The nature of the distribution of powers between the Federal and State governments, and the purpose for this distribution, is perhaps most cogently described by James Madison in The Federalist Papers. Madison describes a dual system in which, like the separation of powers among the three branches, competing Federal and State powers are balanced, reducing the opportunity for tyranny and the excessive accumulation of power at either level, and helping to prevent governmental encroachment on individual liberties. *See, e.g., The Federalist No. 45*, pp. 292–93 (C. Rossiter, ed., 1961); *id.* No. 28, pp. 180–81; *id.* No. 51, p. 323.

**3.** For clear synopses of the legal history of the Commerce Clause, *see United States v. Lopez*, —— U.S. ——, ——–——, 115 S.Ct. 1624, 1626–30, 131 L.Ed.2d 626 (1995); *Perez v. United States*, 402 U.S. 146, 150–52, 91 S.Ct. 1357, 1359–61, 28 L.Ed.2d 686 (1971); *Wickard v. Filburn*, 317 U.S. 111, 120–25, 63 S.Ct. 82, 86–89, 87 L.Ed. 122 (1942).

which Congress made it unlawful "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A). Alfonso Lopez, Jr. was a twelfth grader who arrived at his high school one day with a concealed .38 caliber handgun and five bullets. He was arrested and eventually charged under 18 · U.S.C. § 922.

The majority in this 5–4 decision found that, in 18 U.S.C. § 922, Congress's reach exceeded its grasp. It did so on three primary bases. First, the Court found that § 922 "by its own terms has nothing to do with 'commerce' or any sort of economic enterprise however broadly one might define those terms." *Lopez,* — U.S. at — – —, 115 S.Ct. at 1630–31 (footnote omitted). Nor was § 922 "an essential part of a larger regulation of economic activity" and therefore it could not be assessed in terms of an aggregate effect on interstate commerce. *Id.* at —, 115 S.Ct. at 1631. Second, the Court found that § 922 "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." A "jurisdictional element" is that part of a statute that requires some nexus between the regulated activity and interstate commerce, thereby limiting federal regulation to activities which "have an explicit connection with or effect on interstate commerce." *Id.* Third, the Court found that Congress, although not required to do so, had not supported passage of § 922 with "formal findings as to the substantial burdens that [the regulated] activity has on interstate commerce," which findings could help the Court "evaluate the legislative judgment" that such substantial effect did exist. *Id.* at — – —, 115 S.Ct. at 1631–32 (citations omitted).

It is in directly refuting the government's argumentation that the majority reveals its underlying constitutional justification for striking down the School Zones Act, however laudable the goals of that legislation. The government had argued, in what the Court labeled "costs of crime" reasoning, that possession of a firearm in a school zone could result in violent crime which would in turn

have a dual effect on interstate commerce: (1) the substantial costs of violent crime would eventually be spread throughout the population through increased insurance costs, and (2) violent crime discourages travel into those areas of the nation in which it thrives. *Id.* at —, 115 S.Ct. at 1632. In what the Court called "national productivity" reasoning, the government also argued that the· possession of guns in and around schools would seriously undermine the education process and destroy the learning environment, resulting in less well-educated, less well-prepared students, and therefore less productive citizens, and by extension a less productive national economy. *Id.* at —, 115 S.Ct. at 1632.

Although embraced by the dissenters, *see id.* at — – —, 115 S.Ct. at 1657–71 (Breyer, J., dissenting), these arguments were found by the majority to excuse—in direct contradiction to constitutional restraint on the authority of the Federal government—a general Federal police power. "Cost of crime" reasoning would allow Congress to regulate all activities that might lead to violent crime, however tenuous the connection; "national productivity" reasoning would have a similar spiralling effect, allowing regulation of any activity related to the economic productivity of the citizenry. *Id.* at —, 115 S.Ct. at 1632. "[I]f we were to accept the Government's arguments, we are hardpressed to posit any activity by an individual that Congress is without the power to regulate." *Id.* at —, 115 S.Ct. at 1632. Throughout its history, perhaps the one constant in the Supreme Court's interpretation of the Commerce Clause has been its insistence that it does not give Congress unfettered discretion to regulate within the States. This restriction was recognized by Justice Marshall in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) at 195 ("[t]he enumeration [e.g., regulation of commerce among the States] presupposes something not enumerated [e.g., no regulation of exclusively internal commerce]"), was reiterated throughout the early part of this century, *see, e.g., A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 548, 55 S.Ct. 837, 851, 79 L.Ed. 1570 (1935) (enforcing a since-abandoned distinction between direct (subject to regulation)

and indirect (not subject) effects on interstate commerce and stating that without such distinction "there would be virtually no limit to the federal power and for all practical purposes we should have a completely centralized government"), and has continued to be recognized right through the most expansive jurisprudence of the clause's modern era, *see, e.g., Jones & Laughlin,* 301 U.S. at 37, 57 S.Ct. at 624 (the scope of interstate power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government"). Looking to the outer limits of Commerce Clause power as discussed in *Ogden* and *Jones & Laughlin,* the *Lopez* Court found them overstepped by the School Zones Act. "To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1634.

### B. Constitutionality and Standard of Review

In a second hallmark of our system of government, taking the measure of the outer limits of congressional power is a role reserved to the courts. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1633; *Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 177, 2 L.Ed. 60 (1803) (Marshall, C.J.) (it is for the Courts "to say what the law is"). The importance of this judicial role has been well-established in the area of Commerce Clause jurisprudence. *See, e.g., Maryland v. Wirtz,* 392 U.S. 183, 196–97, 88 S.Ct. 2017, 2023–24, 20 L.Ed.2d 1020 (1968) (however broad the power conferred on Congress by the Commerce Clause, it is for the Court to determine when limits on that power are exceeded). Before discussing why the CSRA, in contrast to the Gun–Free School Zones Act, falls safely on the constitutional side of those limits, it is important first to set out the proper standard of judicial review.

■ A reviewing court must presume the constitutionality of the challenged statute. *See Walters v. National Ass'n of Radiation Survivors,* 468 U.S. 1323, 1324, 105 S.Ct. 11, 12, 82 L.Ed.2d 908 (1984). Although by no means immune from meaningful review, legislation should not be invalidated on the basis of judicial second-guessing of congressional policy decisions, *FCC v. Beach Comm., Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (deference to rationally based legislative judgments "is a paradigm of judicial restraint").

■ As acknowledged in *Lopez,* the role of the reviewing court is a narrow one. A reviewing court is constrained to deciding "whether a rational basis existed for [Congress's] concluding that a regulated activity sufficiently affected interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629; *see Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (a congressional judgment that there is substantial interstate nexus must be deferred to "if there is any rational basis for such a finding"). In *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), which upheld Congress's authority under the Commerce Clause to prohibit racial discrimination in restaurants, the Court wrote that "where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end." *Katzenbach,* 379 U.S. at 303–04, 85 S.Ct. at 383. This modest standard reflects judicial "respect for the institutional competence of Congress on a subject expressly assigned to it by the Constitution and our appreciation of the legitimacy that comes from Congress's political accountability in dealing with matters open to a wide range of possible choices." *Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1651–52 (Souter, J., dissenting); *see Gibbons v. Ogden,* 22 U.S. (9 Wheat.) at 196–97.

If it is determined that a rational basis exists, then "the only remaining question for judicial inquiry is whether 'the means chosen by [Congress] [are] reasonably adapted to

the end permitted by the Constitution.'" *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360 (quoting *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964).

### C. *Lopez* Distinguished

The Supreme Court in *Lopez* reiterated three categories of activity that Congress can regulate when exercising its Commerce Clause power. *Lopez,* — U.S. at —, 115 S.Ct. at 1629; *see Hodel,* 452 U.S. at 276–77, 101 S.Ct. at 2360–61; *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971). These categories are: (1) regulating the use of the channels of interstate commerce; (2) regulating and protecting the instrumentalities of interstate commerce, or persons or things therein, even if the threat is from purely intrastate activities; and (3) regulating activities which have a substantial relation to interstate commerce, that is, substantially affect interstate commerce. *Lopez,* — U.S. at — – —, 115 S.Ct. at 1629–30 (citations omitted).

Turning to the School Zones Act, the *Lopez* Court ruled out the first two categories and assessed the constitutionality of the regulation within the third category only. My analysis begins here. For reasons discussed below, I find that the CSRA should be assessed under both the first and third categories described above. I will first discuss why, even if restricted to the third category, the CSRA is quite distinguishable from the School Zones Act and *Lopez* therefore does not mandate that it be found unconstitutional. I will then discuss how the CSRA also falls within the first category, which provides an independent basis for finding that it is a constitutional exercise of congressional authority. *See United States v. Pappadopoulos,* 64 F.3d 522, 526 (9th Cir.1995) ("these three bases of congressional authority [identified in *Lopez*] are analytically distinct").

### 1. Effect on Interstate Commerce

As *Jones & Laughlin* and its progeny made clear, intrastate, or local, activities are not immune from federal regulation if they are found to have a sufficient impact on interstate regulation. *Jones & Laughlin,* 301 U.S. at 37, 57 S.Ct. at 624 (intrastate

activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions" may be regulated by Congress); *Darby,* 312 U.S. at 118, 61 S.Ct. at 459 ("The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce ... as to make regulation of them appropriate means to the attainment of a legitimate end ...."); *Wrightwood,* 315 U.S. at 119, 62 S.Ct. at 526 (commerce power "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power"); *United States v. Women's Sportswear Mfg. Ass'n,* 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949) ("If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."); *see Hodel,* 452 U.S. at 276–80, 101 S.Ct. at 2360–62; *Katzenbach,* 379 U.S. at 299–301, 85 S.Ct. at 381–82. More specifically, the *Lopez* Court has clarified that, in order for an intrastate activity to be subject to Federal regulation, it must "substantially affect" interstate commerce. *Lopez,* — U.S. at —, 115 S.Ct. at 1630. In another apparent clarification, although not consistently applied throughout the opinion, *Lopez* also instructs that the local activity must itself be an "economic activity." *Lopez,* — U.S. at —, 115 S.Ct. at 1630; *see U.S. v. Robertson,* — U.S. —, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress's power over purely *intrastate commercial activities* that nonetheless have substantial interstate effects.") (emphasis added). *But see Wickard,* 317 U.S. at 125, 63 S.Ct. at 89 ("[E]ven if [the] activity may be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts substantial economic effect on interstate commerce...."); *United States v. Dinwiddie,* 76 F.3d 913, 920 (8th Cir.1996) (upholding Freedom of Access to Clinic Entrances Act against constitutional challenge that the Act did not regulate a commercial entity, but only private conduct

affecting commercial entities which in turn received goods from interstate commerce) (see cases cited); *Cheffer v. Reno,* 55 F.3d 1517, 1521 n. 6 (11th Cir.1995) ("[T]he Court often finds valid under the Commerce Clause statutes which penalize behavior substantially affecting interstate commerce without regard to the actor's commercial or private status.") (citations omitted); *United States v. Wilson,* 73 F.3d 675, 684 (7th Cir.1995) ("There is no authority for the proposition that Congress's power extends only to the regulation of commercial entities."); *Kegel,* 916 F.Supp. at 1238 ("*Wickard* also illustrates that Congress' authority under the Commerce Clause may extend to non-commercial activity by a private actor if it is of the sort capable of repetition to a de[g]ree which substantially affects interstate commerce.").[4]

Having thus sharpened the test—commerce clause power extends to intrastate economic activities having a substantial effect on interstate commerce—the *Lopez* Court's invalidation of the School Zones Act turned primarily on the non-commercial nature of the purely local activity regulated. *Lopez,* — U.S. at —, 115 S.Ct. at 1654 ("this case turns on commercial character") (Souter, J., dissenting). It found that the Act, directed at the possession of a gun within 1000 feet of a school, "ha[d] nothing to do with 'commerce' or any sort of economic enterprise however broadly one might define those terms." *Lopez,* — U.S. at — — —, 115 S.Ct. at 1630–31. Furthermore, the activity regulated

> was not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in

the aggregate, substantially affects interstate commerce.

*Id.* at —, 115 S.Ct. at 1631.

■ I agree with those cases which find that: (1) the target and scope of the CSRA make it readily distinguishable from the School Zones Act, and (2) the payment of child support is an economic activity which, (3) viewed in the aggregate, has a substantial effect on interstate commerce.

The economic nature of the activity regulated by the CSRA is clear. *See Sage,* 906 F.Supp. at 89–90 ("Support payments may not be considered traditional items of 'commerce,' . . . but the non-payment of interstate support obligations is economic activity in a way that mere possession of a handgun in a school zone is not. . . . The non-custodial parent reaps an economic gain each time a support payment is withheld, while the offspring suffers an economic loss."); *Hopper,* 899 F.Supp. at 392 ("The court believes that the act of collecting an obligation, though dealing with an intangible, does amount to commerce."); *Wilson,* 95–MG–3026, at 6 ("It appears clear to this court, however, that payment of money is indeed economic activity.").

This finding is well within the broad definition of "commerce" as established by Supreme Court precedent. In the seminal *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) at 189–90, Justice Marshall wrote that "[c]ommerce, undoubtedly, is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." It has long been recognized that this broadly conceived intercourse includes commerce in intangibles. *See United States v. Shubert,* 348 U.S. 222, 226–27, 75 S.Ct. 277, 280–81, 99 L.Ed. 279 (1955) (dis-

---

4. Giving defendant the benefit of the more stringent test, *i.e.,* that the intrastate activity must be commercial or economic in nature rather than any activity having the requisite substantial effect on intrastate commerce, I have, for purposes of this motion, applied *Lopez*'s restrictive language rather than the more general language of earlier Court pronouncements on the issue. *See, e.g., Hodel,* 452 U.S. at 311, 101 S.Ct. at 2391–92

(referring to the substantial effect on interstate commerce of "a particular activity") (Rehnquist, C.J., concurring), *quoted in Lopez,* — U.S. at — n. 2, 115 S.Ct. at 1629 n. 2; *Wickard,* 317 U.S. at 122, 63 S.Ct. at 88 ("[T]he effects of many kinds of intrastate activity upon interstate commerce [a]re such as to make them a proper subject of federal regulation.").

cussing the terms "trade and commerce" as inclusive of real estate brokerage, collection and distribution of news, provision of medical services to health cooperative members, underwriting insurance, and producing, booking, and presenting local entertainment) (see cases discussed); *United States v. South-Eastern Underwriters Ass'n,* 322 U.S. 533, 546, 64 S.Ct. 1162, 1169–70, 88 L.Ed. 1440 (1944) ("both before and since *Paul v. Virginia,* [75 U.S. (8 Wall.) 168, 19 L.Ed. 357 (1868)] this Court has held that Congress can regulate traffic though it consists of intangibles") (footnote omitted). In *South-Eastern Underwriters,* upholding the regulation of interstate insurance agreements, the Court assessed the spectrum of "commerce" for purposes of the Commerce Clause:

> It is interstate commerce subject to regulation by Congress to carry lottery tickets from state to state. So also is it interstate commerce to transport a woman from Louisiana to Texas in a common carrier; to carry across a state line in a private automobile five quarts of whiskey intended for personal consumption; to drive a stolen automobile from Iowa to South Dakota. Diseased cattle ranging between Georgia and Florida are in commerce; and the transmission of an electrical impulse over a telegraph line between Alabama and Florida is intercourse and subject to paramount federal regulation. Not only, then, may transactions be commerce though noncommercial; they may be commerce though illegal and sporadic, and though they do not utilize common carriers or concern the flow of anything more tangible than electrons and information.

*South-Eastern Underwriters,* 322 U.S. at 549–50, 64 S.Ct. at 1172 (citations omitted); *see also In the Lottery Case (Champion v. Ames),* 188 U.S. 321, 352–53, 23 S.Ct. 321, 325, 47 L.Ed. 492 (1903) (upholding Federal statute criminalizing interstate transport of lottery tickets and defining commerce as inclusive of "navigation, intercourse, communication, traffic, the transit of persons and the transmission of messages by telegraph").

■ Furthermore, it is equally clear that the congressional authority under the Commerce Clause should not be restricted by courts applying an unnecessarily technical construction of the term "commerce." *See Swift & Co. v. United States,* 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518 (1905) ("commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business"); *Wickard,* 317 U.S. at 120, 63 S.Ct. at 87 ("questions of the power of Congress are not to be decided by reference to any formula which would ... foreclose consideration of the actual effects of the activity in question upon interstate commerce"). Rather, the prevailing construction is a practical one. *See Lopez,* —— U.S. at —— ——, 115 S.Ct. at 1636–37 (discussing "the Court's definitive commitment to the practical conception of the commerce power") (Kennedy, J., concurring). In light of the Court's clear pronouncements, only an overly technical, nonpractical construction of the term "commerce" could exclude the payment of child-support obligations.

Even if economic in nature, as child-support payments are, a local activity must still have a substantial effect on interstate commerce before it is subject to Commerce Clause-based regulation. Payment or nonpayment of child-support obligations, viewed in the aggregate, surely has such effect. *See Sage,* 906 F.Supp. at 90 ("the magnitude of the total economic loss and concomitant gain" to the custodial and non-custodial parent, respectively, caused by non-payment of child-support results in a substantial effect on interstate commerce); *Wilson,* 95–MG–3026, at 7 ("When a parent fails to make support payment, that parent has received an economic gain and the custodial parent has suffered an undeniable economic loss. Repeated thousands of times, the economic effects are profound.").

In *Hopper,* the court
> conclude[d] that the collection of child support orders across state lines does involve a continuous and indivisible stream of intercourse among the states involving the transmission of large sums of money and communications by mail, telephone and telegraph. Though each individual transaction may be the result of an order of a court generated intrastate, a chain of

events begins when one parent, custodial or noncustodial, moves across state lines. Child support obligations not voluntarily made become difficult to collect once one parent leaves the boundaries of a particular state. Payment of support results in large sums of money being transmitted, and the amount of child support not paid is significant. Clearly, attempts to collect that past due support involve the mail, telephone and telegraph. This Court must therefore conclude that the CSRA is a proper congressional regulation of an activity that substantially relates to interstate commerce.

*Hopper,* 899 F.Supp. at 393 (footnote omitted). The *Kegel* court has made a similar observation.

Most child support payments owed by the non-custodial parent residing in a different state require the transfer of monies through the channels of interstate commerce. Whether by use of the mail, interstate transportation or through electronic transfer of funds, interstate commerce is significantly involved. The failure to pay child support likewise creates economic intercourse impacting interstate commerce. Efforts at collecting such debts or locating the non-custodial parent so that collection may be facilitated spark the use of all forms of interstate channels of communications and travel. Accepting Congress' statistical findings as accurate, the collective economic impact of such intercourse is substantial to a degree allowing federal regulation.

*Kegel,* 916 F.Supp. at 1238.

As indicated in *Kegel,* Congress supported enactment of the CSRA, unlike the School Zones Act, with significant statistical findings, including the following:

● Of the $48 billion in child-support payments owed nationally *according to court judgments,* $35 billion (or almost 73%) was never collected. See 140 Cong.Rec. S9379, S9430 (1992).

● Of that $35 billion, interstate cases comprise an estimated minimum of $14 billion. *Id.* at S9430–31.

● Approximately nine million children would benefit from the legislation, which would apply to the approximately four million parents who are making court-ordered support payments. *Id.*

● In 1989, $16.3 billion in child-support was due, but only $11.2 billion was paid. H.R.Rep. No. 102–771, 102d Cong., 2d Sess. at 5 (1992). According to other figures cited, the unpaid child-support deficit averages $5 billion per year.

● In 1988, 6.4 million children from homes in which the father was absent were enrolled in Aid to Families with Dependent Children, a number that is rising. *Id.* at 6.

● According to a 1992 report from the General Accounting Office, approximately one-third of all child support cases concern children whose fathers live out-of-state; 57% of custodial parents in interstate cases report receiving child support "occasionally, seldom or never." *Id.* at 6.

Having considered the Act's legislative history, I am compelled to find that a rational basis clearly existed for Congress's determination, in enacting the CSRA, that the non-payment of child-support obligations has a substantial effect on interstate commerce. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (citations omitted).

The second major failing of the School Zones Act noted by the *Lopez* Court was the absence from the Act of a "jurisdictional element that would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. Here, I again agree with my sister courts who have found that the School Zones Act and the CSRA differ markedly. *See, e.g., Sage,* 906 F.Supp. at 91; *Murphy,* 893 F.Supp. at 616; *Hampshire,* 892 F.Supp. at 1329. Whereas the School Zones Act had no express mechanism for ensuring that the possession of the gun had any connection to interstate activity, the CSRA provides an "express jurisdictional element which might limit its reach to a discrete set of [non-custodial parents who fail to pay their court-ordered child-support] that additionally have an explicit connection with or effect on interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631; *see United States v. Sorrentino,* 72 F.3d 294, 296

(2d Cir.1995) (upholding federal criminal statute which "avoids the constitutional deficiency identified in *Lopez* because it requires a legitimate nexus with interstate commerce"). The CSRA only applies to parents who willfully fail to meet child-support obligations "with respect to a child who resides in another state." 18 U.S.C. § 228(a).

> In order to be convicted under the [CSRA], therefore, an individual must not only be outside of the immediate control of the state in which his dependent child resides, but he must be obligated to transfer funds from one state to another. In *Lopez,* there was no such assurance that the interests of residents in different states would come into play before the federal statute could be invoked; nor was there the implicit prerequisite that a monetary transaction take place across state lines, as is the case here.

*Murphy,* 893 F.Supp. at 616.

Unlike the School Zones Act, the CSRA does not require a reviewing court to "pile inference upon inference" in order to establish an interstate nexus. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1634. The nexus is direct, concrete, and express. The government in the present case, again unlike *Lopez,* has no need to resort to inferential "costs of crime" or "national productivity" reasoning. The express interstate jurisdictional element on the face of the statute, particularly in light of Congress's reliance on persuasive statistical evidence of a substantial effect on interstate commerce, obviates the fear, so central to the majority's opinion in *Lopez,* that the challenged regulation "bid[s] fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id.*

Since there is a rational basis for Congress's determination that there is a substantial effect on interstate commerce, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.'" *Lopez,* —— U.S. at ——, 115 S.Ct. at 1651 (citations omitted). I find that the CSRA is reasonably adapted to the permissible end of enforcing court-ordered interstate child-support payments.

I thus conclude that the CSRA passes constitutional muster as an effort by Congress, exercising its powers under to Commerce Clause, to regulate an economic intrastate activity having a substantial effect on interstate commerce.

### 2. Use of Channels of Interstate Commerce

On independent grounds, I also find that the CSRA is a constitutional federal regulation of interstate commerce. *See Kegel,* 916 F.Supp. at 1237; *Collins,* 921 F.Supp. at 1036–37.

As discussed, the first category of activity that Congress may regulate is "the use of the channels of interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629. That is, "the authority of Congress to keep the channels of interstate commerce free from immoral or injurious uses has been frequently sustained, and is no longer open to question." *Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. at 357 (quoting *Caminetti v. United States,* 242 U.S. 470, 491, 37 S.Ct. 192, 196–97, 61 L.Ed. 442 (1917)). When assessing regulations in this category, there is no "substantially affects" element. *See Robertson,* —— U.S. at ——, 115 S.Ct. at 1733.

In addition, the regulated activity need not be commercial in nature, *Heart of Atlanta Motel,* 379 U.S. at 256, 85 S.Ct. at 356–57; *Hoke v. United States,* 227 U.S. 308, 320, 33 S.Ct. 281, 283, 57 L.Ed. 523 (1913); the Supreme Court has frequently upheld regulation of immoral or injurious uses of the channels of interstate commerce that were non-commercial. *See, e.g., United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973) (upholding statute regulating interstate transportation of obscene materials); *Cleveland v. United States,* 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (upholding statute (Mann Act) regulating interstate transportation of women for an immoral purpose (polygamy)), *reh'g denied,* 329 U.S. 830, 67 S.Ct. 361, 362, 91 L.Ed. 704 (1946); *United States v. Hill,* 248 U.S. 420, 39 S.Ct. 143, 63 L.Ed. 337 (1919) (upholding statute regulating interstate transportation (transported on the person and for personal use) of liquor).

■ Interstate commerce is a broadly and practically conceived "intercourse" that "concerns more states than one," as *Gibbons v. Ogden* instructs. *See South–Eastern Underwriters,* 322 U.S. at 551, 64 S.Ct. at 1172 ("No decision of this Court has ever questioned [*Gibbons v. Ogden*] as too comprehensive a description of the subject matter of the Commerce Clause."). Congress's power to regulate in this category, as in the other two, is plenary, and the CSRA falls well within it. Regulation is triggered only if, after a willful failure to pay court-ordered child support, the non-custodial, delinquent parent lives in a state other than the child whose support is not being provided. CSRA is thereby predicated on the court order requiring child-support payment across state lines, which payment must necessarily occur by interstate channels. The willful non-payment of such support is an immoral and injurious misuse of interstate commerce. What is regulated is the payment of a debt from one state and the satisfaction of that debt in another, whether the mechanism used to make this commercial transaction is the United States Mail, an electronic funds transfer, or some other interstate channel. The target of the CSRA is an increasingly prevalent, increasingly serious condition, concerning billions of dollars in unpaid obligations, involving the interests of children and their custodial parents separated by state lines from the non-custodial but putative supporting parent. It is a relatively new and growing national problem—complicated by the layering of governmental, administrative, and bureaucratic rules and regulations that invariably accompany relations between sovereigns—and one that Congress properly addressed using its Commerce Clause power. "The powers conferred by the Commerce Clause ... keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances." *Pensacola Tel. Co. v. Western Union Tel. Co.,* 96 U.S. (6 Otto) 1, 9, 24 L.Ed. 708 (1877).

My conclusion is bolstered by the findings, relied on by Congress in drafting the CSRA, that many non-custodial parents under court order to provide child-support purposefully relocate to another state, knowing that doing so will make it easier to avoid making those payments and more difficult for both the custodial parent and the state from which the court order issued to enforce payment obligations. See 138 Cong.Rec. H7324, H7325 (1992) (reporting "instance after instance where spouses, usually husbands, did not want to pay, went to another State, waited just until the legal process was able to catch up with [them], and then went to another State and started the procedure over again");[5] H.R.Rep. No. 102–771, 102d Cong., 2d Sess. 6 (1992) ("Although there are many reasons for which a parent may fail to make a child support payment, research in this area reveals that a significant number of the parents who fail to pay do so intentionally. The statistics above [one third of all child support cases involve a father living out-of-state and well over half of the custodial parents whose spouse lives out-of-state report receiving payments "occasionally, seldom or never"] suggest that their chances for successfully avoiding such payments increase markedly when they cross state lines."). When "deadbeat" parents shamelessly manipulate a foundation of our system of government—State sovereignty—in order to

**5.** The legislative history discussed here and above supports the constitutionality of the CSRA in its application to non-custodial parents who, unlike defendant, have not fled the state which issued the support order. *See Collins,* 921 F.Supp. at 1034–36 (relying on legislative history to reject the argument that Congress targeted only fleeing non-custodial parents and finding CSRA constitutionally applied to defendant non-custodial parent who remained in-state while his child moved to another state); *Kegel,* 916 F.Supp. at 1237 ("[T]he 'innocent' relocation to a different jurisdiction is no less an injurious use of the channels of interstate commerce than the intentional flight to avoid payment of child support obligations where it is accompanied by non-payment of support obligations."). I thus reject defendant's argument that the jurisdictional nexus of the Act is "vague" because it allows the conduct of a "third party" (i.e., the custodial parent), rather than that of the defendant non-custodial parent, to supply the interstate nexus. *See, e.g., Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977) (for federal statute criminalizing possession of gun by a felon, minimal nexus required only that the gun at some time travelled in interstate commerce, not the felon while in possession of the gun).

avoid paying child support, they undermine an even more fundamental foundation of society—the family. This manipulation can occur with equally detrimental results whether the non-custodial parent purposefully avails him or herself of channels of interstate commerce by fleeing the state which issued the support order, or whether he or she simply seized on the custodial parent and child's relocation out-of-state as an occasion to stop payments. Either route takes advantage of the barriers to enforcement posed by state lines. Whether this evasion and manipulation has reached a crisis point is subject to debate. But there is no requirement, regardless, that Congress need wait until there is a crisis to exercise its Commerce Clause power. It is a "well-settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether physical, moral or economic in nature." *North Am. Co. v. SEC,* 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946) (citation omitted).

## II. Tenth Amendment Challenge

■ Defendant also argues that the CSRA violates the Tenth Amendment of the United States Constitution, which provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Con. amend. X. In light of the above discussion and finding, this argument must fail. When Congress enacted the CSRA, it exercised powers reserved to it by the Commerce Clause. This was a proper exercise of authority and one which does not directly regulate the conduct of the States or usurp State police power. Rather, as will be discussed briefly below, the CSRA provides a compliment to State rules, filling a gap in local enforcement of child-support payments with a remedy only the Federal government can provide. *See Kegel,* 916 F.Supp. at 1235–36 ("The relevant inquiry is not whether the States primarily regulate a particular activity, but whether the federal statute was enacted pursuant to Congress' constitutional authority.");

*Hopper,* 899 F.Supp. at 393; *Hampshire,* 892 F.Supp. at 1330; cf. *New York v. United States,* 505 U.S. at 154–58, 112 S.Ct. at 2417–18.

## III. Federalism and Comity Challenge

In what is essentially a gloss on his Commerce Clause and Tenth Amendment arguments, Nichols further argues that the CSRA violates the principles of federalism and comity. This argument is equally unavailing.

■ If Congress acts lawfully under the Commerce Clause, the mere presence of state regulations regarding the same activity subjected to federal regulation is not enough to frustrate or invalidate Congressional will. *See Cleveland,* 329 U.S. at 19, 67 S.Ct. at 15–16; *Hill,* 248 U.S. at 427, 39 S.Ct. at 145–46. In the *Heart of Atlanta Motel* case for example, the Court specifically noted that thirty-two states had on their books regulations concerning public accommodation when it upheld the public accommodations section of the Civil Rights Act of 1964. *Heart of Atlanta Motel,* 379 U.S. at 259–60, 85 S.Ct. at 358–59.

■ The CSRA is no hamfisted intrusion into affairs better left to state regulation. Rather, it responds to, and only to, documented deficiencies in state enforcement of child-support obligations. Some of these deficiencies were mentioned above in the discussion of the CSRA's legislative history. States, by definition in our two-tiered system of government, are handicapped in enforcing their own rules when those subject to them are not physically present in the state. This is a restraint not imposed on the federal government. The CSRA speaks to the interstitial drag on state police power felt when the state, or the custodial parent, attempts to enforce the "home" state's support order. As Congress has noted, even those states which have criminalized willful non-payment of child-support find efforts to enforce those laws across state boundaries to be "severely limited." H.R.Rep. No. 102–771, 102d Cong., 2d Sess., at 5.

Although most states have adopted the Uniform Reciprocal Enforcement of Support Act, which includes provisions de-

signed to deal with the extradition of interstate child support defendants and the processing of requests for enforcement of support orders, interstate extradition and enforcement in fact remains a tedious, cumbersome and slow method of collection. *Id.* at 6.[6] The CSRA targets only interstate offenders. It responds to "cases which state officials report to be clearly the most difficult to enforce." *Id.* Although Congress may displace, pre-empt, or even prohibit state laws regulating private activity affecting interstate commerce when those laws conflict with federal regulation, *see Hodel,* 452 U.S. at 290–91, 101 S.Ct. at 2367–68, the CSRA does not supplant state authority, but supplements it, both legally and financially.[7]

In his papers, and particularly at oral argument, it became clear that defendant's underlying, recurrent argument is purely policy-based. He would prefer it if Congress would continue to rely on uniform acts in this, as in other, areas of domestic relations. At argument, counsel indicated that the CSRA was the product of both congressional impatience with the Uniform Recipricol Enforcement of Support Act and congressional "pandering" to "special interests," specifically to "feminist groups and child interest groups." See also Deft. Reply Mem. of Law at 1. Counsel also argued that Congress could have found a less intrusive way to achieve the goals of the CSRA. It is not surprising, given his success at avoiding his obligations prior to the CSRA's enactment, that defendant would pine for less direct

federal regulation in this area. That he would have preferred another regulatory scheme, or that he disagrees with the legislative policy behind this one, is immaterial to the present review of the CSRA's constitutionality.

## A. Domestic Relations

Defendant's federalism and comity argument raises the "domestic relations exception to federal jurisdiction." Deft. Mem. of Law at 6. As the very cases relied on by defendant reveal, this reliance is misplaced. The three Fifth Circuit cases cited all deal with the issue of whether a federal court should exercise its jurisdiction in a diversity case to resolve a purely family law or domestic relations matter. *See Crouch v. Crouch,* 566 F.2d 486, 487 (5th Cir.1978) (acknowledging exception but finding it inapplicable); *Rykers v. Alford,* 832 F.2d 895, 900 (5th Cir.1987) (exception required dismissal of state law claims which necessarily required determination of custody rights); *Rogers v. Janzen,* 891 F.2d 95, 98 (5th Cir.1989) (exception applicable and dismissal of state claim appropriate when determination of claim would require intrusive inquiry into marital and familial relationships).

First, this exception is a narrow rule of statutory construction which applies to civil actions brought in federal court based on diversity jurisdiction, 28 U.S.C. § 1332. It has no applicability in a criminal matter brought to federal court with an independent

---

6. Congressman Henry Hyde, a sponsor of the CSRA, cited a report indicating that of all the URESA cases sent out from Michigan courts, the likelihood of the receiving courts' issuing an order in return was only 41%. 138 Cong.Rec. H7324, 7326 (1992). The present case is a textbook example of the difficulty of enforcing support orders across state lines. Nichols moved from New York, where the support order was issued, to Florida, to Vermont. In New York, a contempt order was issued for failure to make the payments. When Mrs. Nichols sought enforcement in Florida, Nichols contested, denying paternity. The Florida court rejected all Nichols' arguments, finding his testimony "laced with perjury, avoidance and vagueness," Complaint at ¶ 6, and again ordered child-support payments. None was made. When Mrs. Nichols sought enforcement in Vermont, the Vermont court found Nichols over half-a-million dollars in ar-

rears and also ordered payments. None was made. Not until an arrest was made in 1995 on a warrant issued by this district on this federal charge was Nichols brought back to New York and before the State Supreme Court that had held him in contempt since 1990.

7. See Section 4 (amending the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3711 *et seq.*), Part P, "Criminal Child Support Enforcement," at § 1601(a) ("Grant Authorization"):

In General.—The Director of the Bureau of Justice Assistance may make grants under this part to the States, for the use by States, and local entities in the States to develop, implement, and enforce criminal interstate child support legislation and coordinate criminal interstate child support efforts.

basis for federal jurisdiction. *See Hampshire*, 892 F.Supp. at 1330.

▮ Secondly, the "domestic relations exception," even when applicable, is not an absolute exception. The Supreme Court has made clear that the exception would prevent a federal court sitting in diversity from deciding core issues of family law such as issuing a divorce, alimony, or child support decrees. *Ankenbrandt v. Richards*, 504 U.S. 689, 703 and n. 6, 112 S.Ct. 2206, 2214–15 n. 6, 119 L.Ed.2d 468 (1992). Enforcing such a decree, however, was found not to cut to the core of domestic relations issues and therefore need not be precluded. *Id.* at 701, 112 S.Ct. at 2213–14 (discussing *Barber v. Barber*, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1858)). Nor does this exception preclude a federal court sitting in diversity from hearing a tort claim for personal injury brought by a child for injury inflicted by a parent. *Id.* at 704, 112 S.Ct. at 2215. The purpose and scope of the CSRA, and the role of the court in deciding a case brought under it, is clearly more akin to an enforcement action or child-against-parent personal injury action than a core matter of family law. *See Kegel*, 916 F.Supp. at 1235; *Hopper*, 899 F.Supp. at 394. Defendant insists, in his papers and again at oral argument, that it is traditionally left to the states to regulate matters of "individual acts within the household." Passing on Congress's plenary Commerce Clause power, the facts of this case belie that description.

Defendant argues that the CSRA could, though not necessarily in his case, require a federal court to go behind the support order itself, especially when it has been entered on default. Defendant, however, is mistaken because collateral attack of state court orders which are elements in federal criminal statutes is exceedingly limited. *See, e.g., Custis v. United States*, 511 U.S. 485, ——, 114 S.Ct. 1732, 1738, 128 L.Ed.2d 517 (1994) (denying right to collaterally attack prior convictions used for sentencing enhancement beyond Sixth Amendment right to counsel); *Lewis v. United States*, 445 U.S. 55, 65, 100 S.Ct. 915, 920–21, 63 L.Ed.2d 198 (defendant charged under federal statute with unlawful possession of firearm by a felon will not be heard to collaterally attack the constitutionality of underlying state conviction).

## IV. Vagueness

▮ Defendant next argues that the CSRA should be void for vagueness because it is "void on its face and devoid of the jurisdictional element required to bring on Federal intervention." Deft. Reply Mem. of Law at 7. I cannot agree with either assertion. First, as noted above, the CSRA, unlike the School Zones Act, contains an express jurisdictional element. Second, as stated in *Lopez*, the purpose of the jurisdictional element is to "ensure, *through a case-by-case inquiry*, that the [regulated activity] in question affects interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631 (emphasis added). Nichols, however, posits this aspect of his motion on an inquiry into a hypothetical case which, in this regard, is diametrically opposed to his own, namely a case in which it is the custodial parent who leaves the state which issued the order of support while the non-custodial parent remains. I need not decide that hypothetical case. *See Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 1928–29, 114 L.Ed.2d 524 (vagueness challenges not invoking the First Amendment must be examined in light of the facts of the case presented), *reh'g denied*, 501 U.S. 1270, 112 S.Ct. 17, 115 L.Ed.2d 1101 (1991). Before me today is a defendant who, not once but twice, has fled to another state to avoid court-ordered child-support payments. As to that defendant, that is, Nichols, there is no articulated challenge that the CSRA is vague. His argument on this point is a non-starter. *See United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960); *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). I nevertheless find affirmatively that the CSRA contains a clear and readily comprehensible statement of sufficient definiteness to allow an ordinary person to understand the conduct it forbids and that the language of the CSRA does not lend itself to arbitrary or discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.),

318

*cert. denied,* 510 U.S. 933, 114 S.Ct. 347, 126 L.Ed.2d 311 (1993).

## V. Equal Protection

 Defendant offers a final challenge to the CSRA based on the Equal Protection Clause of the Fourteenth Amendment, claiming that the Act "promotes selective prosecution of males." Deft. Mem. in Support at 11. In support, defendant asserts that approximately 86% of non-custodial parents are male, that all the cases he has reviewed in preparing his defense involve male defendants, and that the CSRA is therefore "aimed precisely at men." *Id.* This argument fails.

 The CSRA is a gender-neutral statute, targeting non-custodial parents regardless of their sex. An equal protection challenge to a facially neutral statute triggers a two-pronged analysis. "The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert o[r] overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *see also Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976).

Even if I found defendant's bare statistics and fact-finding to constitute a reliable reflection of gender-based adverse impact, which is relevant but not determinative, *id.,* there is not one scintilla of evidence that the CSRA reflects invidious discrimination on the part of its framers. *See Washington,* 426 U.S. at 242, 96 S.Ct. at 2048–49.

## VI. Abstention

 Defendant, citing *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), submits that I should refrain from deciding this case "in furtherance of the promotion of federal-state comity," Deft. Mem. in Support at 9. Defendant argues that in light of the recent New York State Supreme Court settlement agreement and order retaining exclusive jurisdiction over that matter—only reached after defendant had been arrested and returned to this district as a part of the prosecution of the present matter—proceeding in this forum would "possibly frustrate ongoing State Court jurisdiction." *Id.* at 10. I disagree.

I have considered the facts of this case in light not only of the abstention doctrine as articulated in *Younger,* but as articulated in *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 *reh'g denied,* 320 U.S. 214, 63 S.Ct. 1442, 87 L.Ed. 1851 (1943), *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 *reh'g denied sub. nom., Akin v. United States,* 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). I find that abstention in this case would be inappropriate and therefore retain jurisdiction. *See Collins,* 921 F.Supp. at 1032–34 (refusing to abstain from CSRA case); *Hopper,* 899 F.Supp. at 393 (same); *Hampshire,* 892 F.Supp. at 1331 (same).

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is denied. The parties are directed to appear for a conference at 500 Pearl Street, Courtroom 12A, on June 6, 1996 at 3:00 pm.

SO ORDERED.