**REVISED**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No.  95-50721

UNITED STATES OF AMERICA

Plaintiff-Appellant,

VERSUS

KEITH DOUGLAS BAILEY

Defendant-Appellee.

Appeal from the United States District Court
For the Western District of Texas

June 12, 1997

Before POLITZ, Chief Judge, and SMITH and DUHÉ, Circuit Judges.

JOHN M. DUHÉ, JR., Circuit Judge:

We consider for the first time the reach of Congress's authority to enact under the Commerce Clause the Child Support Recovery Act, 18 U.S.C. § 228, which makes it a federal crime to "willfully fail[] to pay a past due support obligation with respect to a child who resides in another state."  We conclude that the Act passes constitutional muster under Congress's plenary powers to regulate both the use of the channels of interstate commerce and persons or things in interstate commerce.  Accordingly, we reverse

and remand for proceedings consistent with this opinion.

## BACKGROUND

In May, 1994, a Texas state court ordered Defendant-Appellee Keith Douglas Bailey to pay $500 per month in child support for his four-year-old son. Thereafter, Bailey established residence in Tennessee and ceased, at least for a period of time, to make the court-ordered payments, a violation of the state court order. The Government, in the United States District Court for the Western District of Texas, responded by charging Bailey with violation of the Child Support Recovery Act ("CSRA" or "Act"), 18 U.S.C. § 228. Bailey moved to dismiss the charge on the ground that § 228 represents an unconstitutional exercise of Congress's legislative power. The district court agreed and dismissed the charge, holding that the CSRA exceeds Congress's authority under the Commerce Clause.

The court offered two reasons in support of its holding. First, relying on the Supreme Court's express reluctance in United States v. Lopez, 115 S. Ct. 1624, 1632 (1995), to involve federal courts in family law matters, the court found constitutionally suspect Congress's attempt to regulate the familial relationship between Mr. and Mrs. Bailey. See United States v. Bailey, 902 F. Supp. 727, 728 (W.D. Tex. 1995). Second, the court cited federalism concerns, stating both that the CSRA is an unconstitutional federal incursion into state criminal prosecutions, see id. at 728-29, and that federal courts faced with defenses challenging the validity of the underlying state court

2

support order would be forced to review and apply these orders in violation of principles of federalism and comity.  See id. at 729. Invoking the domestic relations exception to federal jurisdiction, the court then concluded that the CSRA could not be supported within our constitutional structure.   See id.  The Government timely appeals, arguing that the CSRA not only fits comfortably within Congress's plenary powers under the Commerce Clause but also does not impermissibly upset this nation's delicate federal-state balance.

**DISCUSSION**

We review the constitutionality of a federal statute *de novo*. See Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997).  Under Supreme Court precedent, our review of legislation enacted under the Commerce Clause is circumscribed by a rational basis inquiry. This Court, therefore, may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity sufficiently involves interstate commerce.  See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 276 (1981).

The CSRA punishes the "willful[] fail[ure] to pay a past due support obligation with respect to a child who resides in another State." 18 U.S.C. § 228(a).  The statute defines "past due support obligation" as "any amount--(A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a

3

child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period longer than one year, or is greater than $5,000." 18 U.S.C. § 228(d)(1).

Congress was motivated to enact the CSRA partly by statistics revealing the growing poverty within single-family homes and the observation that financial support from noncustodial parents could combat that poverty. See H.R. Rep. 102-771, at 5 (1992). The House Judiciary Committee reported that in 1989, approximately $5 billion of the $16.3 billion due in child support payments remained unpaid. See id. The Committee emphasized that this deficit is "unacceptably high," especially "in interstate collection cases, where enforcement of support is particularly difficult." Id. In fact, the Committee found that more than one-half of the custodial parents in interstate cases received support payments "occasionally, seldom or never," id., largely because delinquent parents were making "a mockery of State law by fleeing across State lines to avoid enforcement actions by State courts and child support agencies." 138 Cong. Rec. H7324, H7326 (daily ed. Aug. 4, 1992) (statement of Cong. Hyde). Recognizing that state extradition and enforcement "remains a tedious, cumbersome and slow method of collection," see H.R. Rep. No. 102-771, at 6, Congress enacted the CSRA "to strengthen, not to supplant, State enforcement efforts." 138 Cong. Rec. at H7326 (statement of Cong. Hyde).

I

The Commerce Clause delegates to Congress the power to "regulate Commerce with foreign Nations, and among the several

4

States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Early on, the Supreme Court defined Congress's Commerce Clause powers broadly, rejecting the suggestion that "commerce" is narrowly limited only "to traffic, to buying and selling, or the interchange of commodities." See Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 189 (1824). The Court announced, "Commerce undoubtedly is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Id. at 189-90. Since the earlier part of this century, the Court has given breadth to Gibbons's pronouncement and has greatly expanded Congress's authority under this Clause.

The Supreme Court recently summarized the scope of Congress's Commerce Clause powers, identifying three aspects of interstate commerce that Congress may regulate: (1) "the use of the channels of interstate commerce[;]" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities[;]" and (3) "those activities having a substantial relation to interstate commerce." See Lopez, 115 S. Ct. at 1629 (holding that 18 U.S.C. § 922(q), the Gun Free School Zones Act, exceeded Congress's commerce powers because the Act did not regulate economic activity and contained neither a jurisdictional element requiring an interstate nexus nor an express legislative history explaining the Act's connection to interstate commerce). We

5

conclude that the activity regulated by the CSRA falls within the first and second categories of permissible regulation and therefore find that the CSRA is a constitutional exercise of Congress's commerce powers.[1] We decline to reach the question whether the CSRA may also be upheld under the third category.[2]

## A

Bailey challenges the constitutionality of the CSRA first on the basis that the Act, by its terms, lacks a jurisdictional nexus to interstate commerce. The Government replies that because the CSRA operates only when the noncustodial parent and his child reside in different states, a sufficient nexus exists to support jurisdiction. Bailey responds that this requirement is simply a condition precedent guaranteeing only the diversity of state residence that does not, on its face, implicate interstate commerce. We find Bailey's argument unpersuasive.

---

[1]Six other circuits have considered the constitutionality of the CSRA under the Commerce Clause and have found it constitutional for various reasons. See United States v. Johnson, No. 96-4323, 1997 WL 283447 (4th Cir. May 30, 1997); United States v. Parker, 108 F.3d 28 (3d Cir. 1997); United States v. Bongiorno, 106 F.3d 1027 (1st Cir. 1997); United States v. Hampshire, 95 F.3d 999 (10th Cir. 1996), cert. denied, 117 S. Ct. 753 (1997); United States v. Mussari, 95 F.3d 787 (9th Cir. 1996), cert. denied, 117 S. Ct. 1567 (1997); United States v. Sage, 92 F.3d 101 (2d Cir. 1996), cert. denied, 117 S. Ct. 784 (1997). Unless otherwise indicated, we express no opinion as to our acceptance or rejection of the reasoning employed therein.

[2]We are puzzled by the dissent's lengthy focus on the problems attendant with the invocation of the "substantially affects" category in the instant case. See infra Part I.A. As the dissent itself recognizes, we make no effort to defend the constitutionality of the CSRA on the basis that the failure to pay court-ordered child support "substantially affects" interstate commerce.

We note as an initial matter that Bailey is correct in his premise that the diversity of residence between parent and child alone is insufficient to bestow upon Congress the power to regulate under the Commerce Clause. If we were to so hold, we would unwittingly open the floodgates to allowing Congress to regulate any and all activity it so desired, even those activities traditionally reserved for state regulation, so long as opposing parties are diverse. We need not entertain this fear, however, because in CSRA litigation, there is more than just the satisfaction of the diversity-of-residence requirement; there is that *plus* the debt created by the state support order.[3] As discussed below, these in tandem are sufficient to support the constitutionality of the CSRA.

The first category of regulation, "the channels of interstate commerce," refers to "the interstate transportation routes through which persons and goods move." United States v. Parker, 911 F. Supp. 830, 842 (E.D. Pa. 1995), rev'd. on other grounds, 108 F.3d 28 (3d Cir. 1997). The second category, "the instrumentalities of interstate commerce, or persons or things in interstate commerce," includes "regulation or protection pertaining to instrumentalities or things *as they move in* interstate commerce." United States v.

---

[3]Because the creation of the debt is wholly intrastate and because such debt gains interstate characteristics only when one parent moves out-of-state, some argue that the jurisdictional nexus supporting the CSRA really is diversity of residence and thus take issue with our statement that diversity alone is not enough. We disagree. It does not matter that the creation of the debt is wholly intrastate. That fact becomes irrelevant once one party moves out-of-state, because it is at *this* point, and not before, that the government has jurisdiction under the CSRA.

<u>Kirk</u>, 105 F.3d 997, 1008 (5th Cir. 1997) (en banc) (per curium) (opinion of Jones, J.) (emphasis added), <u>petition for cert. filed</u>, 65 U.S.L.W. 3756 (U.S. May 5, 1997) (No. 96-1759).  Bailey's obligation, or debt, to his son not only implicates the use of the channels of interstate commerce but also is itself a thing flowing in interstate commerce.  Bailey's obligation thus falls within the constitutional powers of Congress to regulate for these two reasons.

As to the first category, the child support obligation--made interstate in nature as a direct consequence of the diversity requirement imposed upon the obligor and the obligee--can be satisfied normally by a payment that necessarily must move in interstate commerce.[4]  The mechanism used to complete this

[4]The dissent assails our position as unsupported by the text of the Act, asserting that even if one assumes interstate child support payments "normally" travel in interstate channels, their regulation under the Commerce Clause is unjustified because "the CSRA does not *require* the use of channels or instrumentalities of interstate commerce as a prerequisite to federal regulation." <u>See</u> *infra* Part I.C.  We find this argument infirm.  Whether the CSRA does or does not *require* delinquent parents to use the channels or instrumentalities of interstate commerce is wholly irrelevant.  The dissent's position belies its reluctance to accept the economic and practical realities incident to the collection of child support payments involving a parent and child living in different states. It stretches our collective imaginations to summon one example when compliance with child support orders will not "require[] the regular movement of money and communications across state lines." <u>Bongiorno</u>, 106 F.3d at 1032.  Indeed, the custodial parent's attempts to collect past due support will involve the mail, telephone, and telegraph.  <u>See</u> <u>United States v. Nichols</u>, 928 F. Supp. 302, 312 (S.D.N.Y. 1996), <u>aff'd.</u>, No. 96-1742, 1997 WL 28004 (2d Cir. May 23, 1997) (unpublished). And the delinquent parent's payment of that support will involve the same.  So, while "the record [may not] demonstrate that the child support order in the instant case *required* Mr. Bailey to use" interstate channels, <u>see</u> *infra* Part I.C., we are hard pressed to imagine either how Ms. Bailey would seek collection of (from Texas), or how Mr. Bailey

8

transaction could be the mail, a wire, an electronic transfer of funds, or some other interstate channel.  See Mussari, 95 F.3d at 790; see also Nichols, 928 F. Supp. at 314.  Regardless of the mechanism used, the payment obligation and the payment itself will be placed in the flow of interstate commerce as they invoke the channels or instrumentalities of commerce among the several states.[5]  Bailey's situation illustrates this point:  a resident of Tennessee, Bailey can satisfy his court-ordered support obligation to his child in Texas only by making payments that will cross state lines.  His payment, therefore, must of necessity invoke interstate transportation routes.  Congressional authority will continue to

would send or have sent (from Tennessee), the court-ordered child support payments without invoking the channels or instrumentalities of interstate commerce.

[5]We admit confusion at the dissent's insistence on invoking Lopez as authority in contradiction to our position.  The dissent posits that:

> [u]nlike statutes that contain a jurisdictional nexus element 'which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce,' Lopez, 115 S. Ct. at 1631, the CSRA regulates *every* interstate obligation, without exception.
>
> By its express terms, therefore, the CSRA does not regulate the use of the channels or instrumentalities of interstate commerce, but indiscriminately regulates *all* child support payments.

See *infra* Part I.C.
First, we reiterate that Lopez is inapplicable to our discussion today as it involves solely the interpretation of the "substantially affects" category, which we decline to invoke here as a constitutional justification for the CSRA.  Second, in any event, Lopez is readily distinguishable.  Whereas the Gun-Free School Zones Act offered no means by which courts could ensure that a nexus between the regulated activity and interstate commerce existed, the CSRA expressly limits its reach to those child support debts that cross state lines.  See Bongiorno, 106 F.3d at 1033; Nichols, 928 F. Supp. at 312-13.

9

exist over defendants in CSRA litigation as long as the transaction contemplated by the state court order flows in interstate commerce.[6]  See, e.g., Associated Press v. NLRB, 301 U.S. 103, 128 (1937) (holding that the Associated Press's not-for-profit newsgathering activities "amount[ed] to commerical intercourse . . . within the meaning of the Constitution" because it "involve[d] the constant use of channels of interstate . . . communication"), cited in Camps Newfound/Owatonna, Inc. v. Town of Harrison, No. 94-1988, 1997 WL 255351, at *10 (U.S. May 19, 1997).

As to the second category, the child support obligation itself is a thing of commerce that has acquired an interstate character.[7]

_____

[6]That the CSRA is invoked whether the noncustodial parent flees across state lines to avoid his payment obligation or the noncustodial parent takes advantage of the custodial parent and child's movement out-of-state as occasion to stop payment is irrelevant in assessing the constitutionality of the CSRA.  Either circumstance "takes advantage of the barriers to enforcement posed by state lines."  Nichols, 928 F. Supp. at 315.  Although some legislative history indicates the CSRA was motivated to punish a noncustodial parent's flight to avoid payment, other legislative history indicates that that situation was not the exclusive focus of the CSRA.  See H.R. Rep. No. 771, at 6.  Moreover, the text of the statute is not predicated upon the defendant's flight; it is predicated simply on the willful failure of the noncustodial parent to pay an interstate debt.  In any event, Bailey's challenge to the constitutionality of the CSRA on this ground must fail as applied in the instant case because Bailey himself fled across state lines.

[7]Defining "commerce" as "tantamount to 'trade,'" the dissent crisply states that child support obligations are not commerce:  "They are unilateral obligations, not bilateral commercial transactions . . . . Consequently, child support payments do not entail a *quid pro quo*, the defining characteristic of a commercial transaction."  See *infra* Part I.B.  These are bald assertions indeed, and the cases cited in support are unavailing.  That "commerce" has been defined to *include* "trade," see, e.g., Camps Newfound/Owatonna, 1997 WL 255351, at *5; United States v. Robertson, 115 S. Ct. 1732, 1733 (1995) (per curium); United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 539 (1944); Jordan v. Tashiro, 278 U.S. 123, 127-28 (1928); Welton v. Missouri,

10

See Bongiorno, 106 F.3d at 1032; Mussari, 95 F.3d at 790. This debt continues to move in interstate commerce as long as the obligor and obligee reside in different states and as long as the debt actually exists. Both the contemplated payment and the obligation, therefore, independently form the nexus to interstate commerce.

B

Challenging the Act's constitutionality under the first category of Commerce Clause authority, Bailey next argues that by regulating his *breach* of a state court order, the CSRA in actuality impermissibly allows federal courts to exercise jurisdiction over his *failure* to use interstate channels of commerce. Bailey

91 U.S. 275, 280 (1875), does not compel the conclusion, as the dissent would have us believe, that "commerce" is *limited* to trade.

Were we to support such a narrow definition, we would find ourselves inimical to those cases holding, for example, that it is interstate commerce to transport a woman from one state to another in a common carrier, Hoke v. United States, 227 U.S. 308, 320-23 (1913); to carry across a state line in a private automobile five quarts of whiskey intended for personal consumption, United States v. Simpson, 252 U.S. 465, 467 (1920); and to transmit information over interstate telegraph lines, Pensacola Tel. Co. v. Western Union Tel. Co., 96 U.S. (6 Otto) 1, 11 (1877), all cited in South-Eastern, 322 U.S. at 549.

The construction of the term "commerce" is a practical one and embraces economic activity beyond that which is traditionally considered commerce. See Lopez, 115 S. Ct. at 1636-37; see also Swift & Co. v. United States, 196 U.S. 375, 398 (1905). Child support obligations and their ensuing payments constitute economic activity and are thus properly the subject of Commerce Clause regulation. See, e.g., Parker, 108 F.3d at 31 ("Failure to make required payments gives rise to a debt which implicates economic activity."); Hampshire, 95 F.3d at 1003 (holding that court-ordered obligation to pay money interstate is economic activity regulable by Congress); Sage, 92 F.3d at 105 ("This [CSRA] case involves matters that plainly meet [the definition in Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 189 (1824)] of commerce among the several States. The Act presupposes intercourse, an obligation to pay money, and the intercourse concerns more States than one.").

11

maintains that the CSRA, when reduced to its essence, is not a regulation of already existing commerce but a jurisdictional bootstrap enacted by Congress to force individuals to use interstate commerce. These arguments lack merit.

1

Addressing Bailey's first contention, we point out that the CSRA is not a regulation of the nonuse of interstate channels. Bailey made use of the interstate channels, as contemplated by the CSRA, the moment he moved away from Texas without fulfilling his child support obligation.[8] See Camps Newfound/Owatonna, 1997 WL 255351, at *5 (observing that "the transportation of persons across state lines . . . has long been recognized as a form of 'commerce'." (citing Edwards v. California, 314 U.S. 160, 172 & n.1 (1941) (noting that "[i]t is immaterial whether or not the transportation is commercial in character"))). He himself thereby placed the debt in the flow of interstate commerce. Bailey, therefore, is not doing nothing. Moreover, by failing to pay his debt, he is willfully violating a state court order requiring him to do something, *viz.,* to consummate an interstate transaction. His delinquency serves only to frustrate this consummation. The

---

[8] "By this reasoning," the dissent conjectures, "any person moving to another state *ipso facto* federalizes all his financial obligations, and 'utilizes' the channels of interstate commerce, merely by crossing a state line." See *infra* note 12. Our opinion today holds nothing of the sort, and the dissent's attempt to characterize it otherwise is tortured. Our opinion does not stand for the proposition that all interstate financial obligations are subject to federal regulation but only that congressional attempts at the federal *enforcement* of such obligations are, once state initiatives have failed.

12

CSRA, designed to address this problem, seeks to prevent the frustration of an interstate commercial transaction that otherwise would have occurred absent the defendant's dereliction. It is thus subject to federal control for that reason. We agree with the Second Circuit that "[i]f Congress can take measures under the Commerce Clause to foster potential interstate commerce, it surely has power to prevent the frustration of an obligation to engage in commerce." Sage, 92 F.3d at 105-06 (holding CSRA constitutional on grounds that it is valid regulation of instrumentalities of, or things or persons moving in, interstate commerce); accord Hampshire, 95 F.3d at 1003. Supreme Court precedent supports this position.

In Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 286 (1921), the defendant, a Kentucky farmer, contracted with a Tennessee corporation to deliver wheat via rail cars to the corporation's Tennessee flour mill. The farmer sent some wheat but refused to deliver the rest, and the flour mill sued in Kentucky state court for breach of contract. Id. The farmer insisted the contract was invalid insofar as the plaintiff had failed to satisfy a Kentucky statute imposing conditions on out-of-state corporations contracting with local entities. Id. Rejecting this defense, the Court held that the state statute did not afford the farmer relief because it was "repugnant to the commerce clause" insofar as the contract was "a part of interstate commerce, in which the plaintiff lawfully could engage without any permission from the state of Kentucky." Id. at 292-93. The Court therefore rejected, on

13

Commerce Clause grounds, the farmer's attempt to frustrate the satisfaction of his obligation to pay on the interstate contract.

Although the instant case involves an obligation arising from a court order, not a contract, the premise is the same:  as was true of the farmer's contractual obligation, Bailey's obligation to send money across state lines immerses him in commerce among the several states.  See Sage, 92 F.3d at 106; United States v. Lewis, 936 F. Supp. 1093, 1097 (D.R.I. 1996) (characterizing CSRA as statute that essentially penalizes the failure to pay an interstate debt, and citing First Circuit case holding that debt collection directly involves interstate commerce (citation omitted)); see also Sonneborn Bros. v. Cureton, 262 U.S. 506, 515 (1923) (holding that contracts for interstate sale and delivery of oil are "transactions [that] are interstate commerce in its essence").  Furthermore, it cannot be overlooked that if we were to accept Bailey's nonuse reasoning, "Congress would be permitted to regulate parents who *underpay* their required child support but not parents who fail to pay their required child support at all.  Such an interpretation is unfathomable."  Lewis, 936 F. Supp. at 1097.

We pause to note that even if Congress sought, through the CSRA, to regulate the nonuse of interstate channels, it would still be within its constitutional command to do so.  The Supreme Court has often held, in several contexts, that the defendant's nonuse of interstate channels alone does not shield him from federal purview under the Commerce Clause.  In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 250 (1964), the Court upheld Commerce

14

Clause jurisdiction over a local motel that failed to engage in interstate commerce when it refused to rent rooms to black guests. The Court held that by failing to rent the rooms, the hotel inhibited black travelers from crossing state lines and thus obstructed interstate commerce that otherwise would have occurred. Id. at 253. In Standard Oil Co. v. United States, 221 U.S. 1, 68 (1911), the Court upheld the Sherman Act, 15 U.S.C. §§ 1, 2, as permissible congressional action under the Commerce Clause. The Sherman Act prohibits restraints of trade and obstructions of interstate commerce in order to facilitate commerce that otherwise would occur absent the defendant's monopolistic behavior. Finally, in United States v. Green, 350 U.S. 415, 420 (1956), the Court found constitutional the Hobbs Act, 18 U.S.C. § 1951, which punishes "interference with interstate commerce by extortion, robbery or physical violence [by] . . . outlaw[ing] such interference 'in any way or degree.'" To accept Bailey's nonuse argument would mean, as emphasized by the Second Circuit, that "Congress would have no power to prohibit a monopoly so complete as to thwart all other interstate commerce in a line of trade[;]" or to punish under the Hobbs Act "someone who successfully prevented interstate trade by extortion and murder." Sage, 92 F.3d at 105.[9]

---

[9]Our position should not be taken to support "the more radical proposition that Congress is empowered to regulate the *passive* failure of individuals to engage in interstate commerce," see *infra* note 15, as the dissent argues, for we say nothing of the sort. The cases cited herein hold that Congress has the power under the aegis of the Commerce Clause to prevent the obstruction of commerce. Bailey's "intentional refusal to satisfy [his] debt is as much an obstruction of commerce between the states as any act" made unlawful by the public accommodations provisions of the Civil

15

Moreover, we disagree with those who attempt to distinguish these cases as concerned with something more traditionally commercial than the payment of child support obligations. The payment of support obligations is indeed commercial; it involves the transfer of money from one hand to another. In fact, nothing could be more commercial.[10] That the underlying reason for the obligation relates to a matter of domestic relations does not detract from this position.

2

In response to Bailey's jurisdictional bootstrap argument, we emphasize that Congress did not impose the underlying obligation to pay child support. The CSRA applies only when the defendant has violated a state court order imposing upon him that obligation. The state court order, therefore, not the CSRA, obliges Bailey to pay, and his volitional movement out of state, in tandem with his

---

Rights Act of 1964, by the Sherman Act, or by the Hobbs Act. See Mussari, 95 F.3d at 790.

   [10]The dissent impugns this statement as *ipse dixit* and as an invitation to Congress "to regulate *all* financial transactions." See *infra* Part I.B. its attack is a mischaracterization of our holding, which is limited only to the interstate payment and collection of child support obligations and nothing more.
   Furthermore, we pause here to note that the Supreme Court has explained that commerce exists among the several states where there is "a 'continuous and indivisible stream of intercourse among the states' involving the transmission of large sums of money and communications by mail, telephone, and telegraph." United States v. Shubert, 348 U.S. 222, 226 (1955) (quoting South-Eastern, 322 U.S. at 541 (holding that insurance business falls within aegis of Commerce Clause because it is marked by, *inter alia*, collection of premiums and payments of policy obligations)); accord Bongiorno, 106 F.3d at 1031 (holding CSRA constitutional under Commerce Clause); United States v. Hopper, 899 F. Supp. 389, 393 (S.D. Ind. 1995) (same).

willful failure to fulfill that obligation, places that obligation in interstate commerce. Congress has simply brought its Article I, section 8 powers to bear on an activity which now carries the mettle of an interstate transaction. For the reasons above, we hold the CSRA falls within Congress's Commerce Clause authority.

## II

### A

Bailey next argues that the CSRA transgresses state sovereignty by running afoul of the domestic relations exception to diversity jurisdiction, an exception that has not received express constitutional acceptance but nonetheless is respected by federal courts. See, e.g. Ankenbrandt v. Richards, 504 U.S. 689, 693-94 (1992); Barber v. Barber, 62 U.S. (21 How.) 582 (1858). The domestic relations exception obtains from the diversity jurisdiction statute, 28 U.S.C. § 1332, see Ankenbrandt, 504 U.S. at 700-01, and therefore it has no application where, as here, there exists an independent basis for federal jurisdiction. The instant action is based not on diversity but on an express grant of jurisdictional authority under 28 U.S.C. § 1331. Because this case clearly arises under this Court's federal question jurisdiction, the domestic relations exception presents no bar.

Moreover, any analogy to the domestic relations exception fails. Federal courts have long divested themselves of jurisdiction over only the *issuance* of divorce, alimony, and child custody decrees, finding that such domestic relations matters are within the unique province of state courts to decide. See id. at

17

703-04 (articulating policy considerations behind exception). The CSRA in no way endeavors to regulate this hallowed ground;[11] it seeks merely to *enforce* a child support order already promulgated by a state court. The only aspect of domestic relations implicated in a CSRA litigation is the family law character of the underlying support order. That alone, however, is insufficient to invoke the domestic relations exception to federal courts' otherwise proper jurisdiction. See id. at 706-07 (holding that domestic relations exception did not bar a case involving alleged sexual and physical abuse committed by plaintiff's former husband against their children because case did not involve issuance of divorce, alimony, or child custody decree); see also Lewis, 936 F. Supp. at 1106 (citing cases involving underlying divorce or child custody proceedings in which federal courts exercised jurisdiction despite domestic relations exception because actual claim being litigated did not involve familial relations).

Our decision today does not stray from our prior holding in Rogers v. Janzen, 891 F.2d 95 (5th Cir. 1989). Rogers is a diversity action between former spouses in which the plaintiff sought damages for emotional distress suffered when her former

---

[11]The dissent presents no support for its untenable position to the contrary. Apparently ignoring our discussion here, the dissent contends that the CSRA intrudes upon matters of family law, thereby "subverting the federal system." See *infra* Part I.A. The dissent fails to recognize, however, that the imposition of federal penalties for the failure to pay child support does not occasion a "federal intervention in the field of family law," as it claims, but rather is akin to enforcement actions "over which the federal courts have long accepted jurisdiction." United States v. Kegel, 916 F. Supp. 1233, 1235 (M.D. Fla. 1996).

husband allegedly sexually abused their daughter and denied her access to the child. Id. at 96. We held that although the plaintiff's claims sounded in tort and thus did "not fall squarely within the traditional scope of the field of domestic relations," federal court resolution was inappropriate because hearing the claim would necessitate that type of inquiry into the marital relationship better conducted by state courts. Id. at 98. We explained that at the heart of the plaintiff's suit was the allegation that her former husband had sexually abused their daughter. Id. Federal court resolution of this issue would therefore require relitigation of factual determinations made by the state court prior to its custody award and thus create the risk of incongruous federal and state decrees. Id.

Significantly, we suggested that had the plaintiff's action been "one in which the court need only decide whether an already-set custody or child support award has been complied with," federal jurisdiction would have been proper. Id. (internal quotations omitted). The case before us involves just that. Federal courts need not resuscitate final state court proceedings to enforce the underlying child support order. We need only press upon Bailey the great weight of the federal courts in an effort to compel him to fulfill his legal obligations under state law.

B

1

Bailey next argues that the CSRA offends principles of federalism and comity. He insists the Act calls for federal review

and application of state court orders and thereby increases the possibility of federal courts upsetting the federal-state balance of power established by the Constitution. The district court in Mussari illustrated the alleged offense to our federal structure this way:

> A defendant being prosecuted under the CSRA could arguably defend the action by challenging the validity of the underlying state court support order. Either the federal court would be forced to review the support order, or stay the pending federal criminal case while the support order is collaterally attacked in state court. Neither of these scenarios is desirable in light of the principles of comity and the speedy trial provisions federal courts are bound by in criminal matters.

United States v. Mussari, 894 F. Supp. 1360, 1367 (D. Ariz. 1995), rev'd., 95 F.3d 789 (9th Cir. 1996), cert. denied, 117 S. Ct. 1567 (1997). We adopt the succinct response of the court in United States v. Ganaposki, 930 F. Supp. 1076, 1083 (M.D. Pa. 1996):

> [T]he CSRA goes no further than the enforcement of state court decrees and is not an attempt by Congress to legislate with respect to the amount of child support payments in any particular case; any ruling that support must be paid and the amount to be paid is left to the states.

A CSRA prosecution turns only on the defendant's violation of a state court order. It does not turn on the fairness of the order, the reasons underlying the state court's issuance of the order, the defendant's relationship with his children or former spouse, or any other matter involving relitigation of a family law issue. Moreover, there is no language in the CSRA allowing the federal court to look beyond the four corners of the state child support order or permitting the defendant to collaterally attack the state

20

court order in federal court.

## 2

Bailey also questions whether Congress, in enacting the CSRA, has intruded upon the states' traditional dominion to enact criminal laws. In the interests of federalism and comity, Bailey disputes Congress's authority to criminalize that behavior, *viz.* the willful failure to pay court-ordered child support, which some states have chosen specifically not to address, for whatever reasons. Moreover, he contends that when Congress criminalizes conduct already condemned by a state, as Texas has done here, see Tex. Penal Code Ann. § 25.05 (West 1993), it insults the delicate balance between federal and state criminal jurisdiction. See, e.g., United States v. Enmons, 410 U.S. 396, 411-12 (1973).

Bailey's argument fails to recognize that principles of federalism and comity are not compromised when the regulated activity falls inside constitutionally-defined perimeters of congressional control. Concluding that the CSRA survives a Commerce Clause challenge, we cannot now say Congress has improperly arrogated the state's prerogative to penalize the willful failure to pay child support; Congress draws its authority to criminalize the same from its plenary powers under the Commerce Clause.

## C

Bailey next argues that the CSRA tramples upon the state's sovereign right to legislate in matters of family law and thus contravenes the Tenth Amendment. We find no merit in this

21

position.  The Tenth Amendment provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  "In a case . . . involving the division of authority between federal and state governments, the . . . inquiries [under the Commerce Clause and the Tenth Amendment] are mirror images of each other.  If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress."  New York v. United States, 505 U.S. 144, 156 (1992).

When Congress enacted the CSRA, it acted pursuant to its delegated powers under the Commerce Clause.  It did not usurp the state's police powers to regulate purely intrastate matters of family or criminal law.  Penalizing those who willfully fail to comply with child support obligations, the CSRA regulates purely private conduct and makes no attempt to regulate states as states.  See id.  In fact, the legislative history indicates the CSRA is designed to aid state efforts, which unfortunately often are unsuccessful, to enforce interstate support orders.  The CSRA in no way intends to supplant them.  Bailey's Tenth Amendment argument therefore fails.

## CONCLUSION

For the reasons discussed above, we find the constitutional

22

objections unavailing.  The CSRA does not exceed Congress's powers under the Commerce Clause nor does it encroach on matters within the province of state sovereignty.  Federal jurisdiction is therefore proper.  We accordingly REVERSE and REMAND.

ENDRECORD

JERRY E. SMITH, Circuit Judge, dissenting:

In *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995), the Court reaffirmed the fundamental principle that the Constitution established a national government of enumerated and limited powers.  Accordingly, the Court emphasized that the power granted to Congress under the Commerce Clause is subject to strict limits, and it is the duty of the courts to police those limits and thereby preserve the federal system.

Therefore, laws enacted under the aegis of the Commerce Clause "'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'"  115 S. Ct. at 1628-29 (*quoting NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)).  *Lopez* is a landmark, signaling the revival of federalism as a constitutional principle, and it must be acknowledged as a watershed decision in the history of the Commerce Clause.[12]

The lessons of *Lopez* are lost, however, in the instant case. Rather than rigorously enforcing the limitations on federal power,

---

[12] This court has recognized that *Lopez* is a landmark in constitutional law, even if the judges have disagreed as to the precise boundaries of the Commerce Clause.  *Compare United States v. Kirk*, 105 F.3d 997, 999 (5th Cir. 1997) (en banc) (opinion of Higginbotham, J.) (recognizing that "'if *Lopez* means anything, it is that Congress's power under the Commerce Clause must have some limits'") (quoting *United States v. Rybar*, 103 F.3d 273, 291 (3d Cir. 1996) (Alito, J., dissenting)) *with id*. at 1010 (opinion of Jones, J.) (recognizing that *Lopez* establishes the "outer boundary on Congress's criminal jurisdiction under the Commerce Clause").

as *Lopez* commands, the panel majority upholds the constitutionality of a statute that contains no reference to interstate commerce, regulates an activity that is not commercial, and invades the field of family law, a traditional area of exclusive state sovereignty. Therefore, I conclude that the Child Support Recovery Act ("CSRA") flouts the limitations on the Commerce Clause, flies in the face of *Lopez*, and threatens to "'obliterate the distinction between what is national and what is local and create a completely centralized government.'" *Id*. at 1629.

This is a difficult area, and the panel majority has made a diligent effort to reconcile the relevant jurisprudence as it applies to this case. Disagreeing with the majority's conclusion, however, I respectfully dissent.

I.

As the *Lopez* Court recognized, *see id.* at 1626-27, the seminal case describing the commerce power is *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824), in which Chief Justice Marshall, writing for the Court, defined the appropriate methodology for reviewing an act of Congress as asking (1) whether the subject of the legislation is commerce; (2) if so, whether the commerce affects other states; and (3) whether the legislation regulates the commerce. *Id.* at 189-97. In *Lopez*, the Court identified three broad categories of activities that Congress may regulate under the Commerce Clause. First, it may regulate the use of the channels of interstate commerce. Second, it is empowered to regulate and protect the

25

instrumentalities of interstate commerce, or persons or things in interstate commerce. Finally, it may regulate those activities that "substantially affect" interstate commerce. *Id*. at 1629-30. None of these categories of commerce legislation, however, encompasses the CSRA.

## A.

Although the authority to regulate intrastate activities that "substantially affect" interstate commerce has provided the primary source for the dramatic expansion of federal power in this century, as well as the foundation for recent Commerce Clause jurisprudence, the majority wisely declines to defend the constitutionality of the CSRA by claiming that unpaid child support "substantially affects" interstate commerce. In *Lopez*, the Supreme Court disavowed the use of speculative economic theories to prove that a given activity "substantially affects" interstate commerce, as the employment of such theories would permit Congress to "regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody), for example." *Id*. at 1632. Yet that is precisely what the CSRA purports to do. Consequently, the constitutionality of the CSRA cannot be sustained under the "affecting commerce" prong.

The "affecting commerce" doctrine is a judicial invention, rather than a faithful interpretation of the constitutional text. The Commerce Clause authorizes Congress to regulate *commerce among the several states*, not an *activity that affects commerce*.

26

Likewise, *Gibbons* explains that the test of a statute enacted under the Commerce Clause is whether the legislation regulates commerce, not whether it regulates some *activity that affects commerce*. Indeed, Gibbons asks whether the *commerce* affects other states, not whether the *activity* affects interstate commerce. *See Gibbons*, 22 U.S. at 194-95.[13] Nevertheless, the Supreme Court has presided over a dramatic expansion of the Commerce Clause in this century, authorizing the federal government to regulate any activity that "substantially affects" interstate commerce. *See, e.g., United States v. Darby*, 312 U.S. 100, 118-23 (1941); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942).[14]

In *Lopez*, the Court acknowledged that the "affecting commerce" doctrine is a legitimate interpretation of the Commerce Clause only insofar as it preserves some limit on the scope of federal power, vindicating the principle that the Constitution established a government of enumerated powers and preserving the distinction between that which is truly national and that which is indeed local. *Id*. at 1634. To illustrate the limitations of the commerce power, the Court disavowed any use of the "affecting commerce" doctrine that would justify federal intervention in the field of

---

[13] Neither the constitutional text nor *Gibbons* uses the term "interstate," but I will employ it, as *Lopez* and other construing opinions have used it almost universally.

[14] *See Lopez*, 115 S. Ct. at 1642-50 (Thomas, J., concurring) (discussing the evolution of the "affecting commerce" doctrine).

family law. *See id*. at 1632.[15] Yet the CSRA occasions just such an intrusion, subverting the federal system by imposing federal penalties for the failure to pay state-ordered child support.

The *Lopez* Court warned that if Congress can invoke the "affecting commerce" doctrine to invade traditional areas of state sovereignty, such as family law, "we are hard-pressed to posit any activity by an individual that Congress is without power to regulate." *Id*. at 1632. Accordingly, the Court recognized that such an expansive interpretation of the Commerce Clause "would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Id*. at 1634.

Because the Supreme Court has abjured the federal regulation of family law under the guise of the "affecting commerce" doctrine, the panel majority is forced to defend the constitutionality of the CSRA by claiming that the act satisfies the first two prongs of *Lopez*. But federal criminalization of the failure to make child support payments regulates neither the channels nor the instrumentalities of interstate commerce, nor persons or things in interstate commerce.


B.

The CSRA imposes criminal penalties on parents who fail to satisfy an interstate child support obligation. If the payment of

---

[15] Indeed, even the dissenters in *Lopez* agreed that family law is beyond the power of Congress to regulate under the Commerce Clause. *See*, *e.g.*, *Lopez*, 115 S. Ct. at 1661 (Breyer, J., dissenting).

child support constituted "commerce," therefore, it would necessarily follow that interstate child support payments are "things in interstate commerce," within the meaning of *Lopez*. For purposes of the Commerce Clause, however, child support payments are not "commerce."

The majority dismisses this objection with a wave of the hand, assuming that court-ordered child support payments are "commerce": "The payment of support obligations is indeed commercial; it involves the transfer of money from one hand to another. In fact, nothing could be more commercial." Not surprisingly, the majority can offer no authority to support this *ipse dixit*, which would permit Congress to regulate *all* financial transactions. Such an unlimited definition would swell the Commerce Clause far beyond the traditional context of "commerce."[16] In fact, "commerce" requires more than a mere transfer of wealth, as the history of Commerce Clause jurisprudence demonstrates.

In *Gibbons*, Chief Justice Marshall rejected a narrow definition that would limit the term "commerce" to traffic, buying and selling, and the interchange of commodities. *Id*. at 189. Instead, *Gibbons* defined "commerce" broadly to include "the commercial intercourse between nations, and parts of nations." *Id*. at 189-90. Even under this broad definition, however, the Commerce Clause does not grant Congress *carte blanche*. To the contrary, Congress may regulate only *commercial* intercourse, so its power is

---

[16] Under this definition, for example, Congress would be free to regulate alimony, wills and estates, gift promises, and charitable contributions, invading traditional areas of state sovereignty under the guise of the Commerce Clause.

29

confined to the regulation of trade, business transactions, and economic activity.[17]  Therefore, in order to constitute a "person or thing in interstate commerce," subject to direct regulation under the Commerce Clause, a person or thing must be engaged in "commercial intercourse."[18]

We should interpret terms such as "commerce" in the context of the common understanding of them at the time they were written.  It is axiomatic that the word "commerce" is, and has always been, tantamount to "trade," the exchange of goods and services by purchase and sale.  *See, e.g.*, BLACK'S LAW DICTIONARY 269 (6th ed. 1990); WEBSTER'S NEW INT'L DICTIONARY 538 (2d ed. 1958).  The cornerstone of the commerce power, ever since the founding era, has been the power to regulate trade.  "Whatever other meanings 'commerce' may have included in 1787, the dictionaries, encyclopedias, and other books of the period show that it included trade: business in which persons bought and sold, bargained and contracted.  And this meaning has persisted to modern times."

---

[17] *See Jordan v. Tashiro*, 278 U.S. 123, 127-28 (1928) (noting that "for more than a century it has been judicially recognized that in a broad sense [commerce] embraces every phase of commercial and business activity and intercourse"); *Welton v. Missouri*, 91 U.S. 275, 280 (1875) (noting that commerce "comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between the citizens of our country and the citizens or subject of other countries, and between the citizens of different States").

[18] This is not to say that non-commercial activities are beyond the reach  of the Commerce Clause, but merely that they are not interstate commerce *per se* and cannot be regulated directly as "things in interstate commerce."  To regulate such non-commercial activities, therefore, Congress must legislate indirectly, pursuant to the *Lopez* categories (e.g., the channels of interstate commerce, the instrumentalities of interstate commerce, or activities that "substantially affect" interstate commerce").  In this respect, *Lopez* is consistent with prior caselaw in departing from *Gibbons* and from the constitutional text in that, as I have pointed out, neither the text nor *Gibbons* refers to *activity* that affects interstate commerce.

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 539 (1944).[19]

Indeed, the essential characteristic of "commerce" continues to be its relationship to business and trade. The Supreme Court recently reaffirmed that a party is "in commerce" when it is "'directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.'" *United States v. Robertson*, 115 S. Ct. 1732, 1733 (1995) (quoting *United States v. American Bldg. Maintenance Indus.*, 422 U.S. 271, 283 (1975)).[20] In order to constitute "a thing in interstate commerce," therefore, subject to direct regulation under the Commerce Clause, the subject of federal regulation must be engaged in "commerce," which is tantamount to "commercial intercourse" or "trade."

Child support payments, accordingly, are not "commerce." They are unilateral obligations, not bilateral commercial transactions; they do not involve trade; and they do not entail the purchase or sale of goods or services. As the plain language of the statute attests, the CSRA regulates only child support obligations required pursuant to a court order or an order of an administrative process, not a private contract. *See* 18 U.S.C. § 228(d)(1)(A). Therefore, payment of child support is not conditioned on the performance of

---

[19] *See also Lopez*, 115 S. Ct. at 1643 (Thomas, J., concurring) ("At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes.").

[20] Likewise, the Court recently observed that a party is deemed to be "engaged in commerce" if it is a purchaser or provider of "goods and services." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, No. 94-1988, 1997 WL 255351, at *5 (U.S. May 19, 1997).

a reciprocal duty by the obligee, nor does it benefit the obligor. Consequently, child support payments do not entail a *quid pro quo*, the defining characteristic of a commercial transaction.

In short, child support payments include none of the elements of commerce, but merely represent transfers of wealth pursuant to a court order.  Like the Gun Free School Zones Act invalidated in *Lopez*, therefore, the CSRA is "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."  *See Lopez*, 115 S. Ct. at 1630-31.

The conclusion that child support payments are not "commerce" requires us to define the boundaries of the Commerce Clause, distinguishing between "commercial" and "noncommercial" activities.  In *Lopez*, the Court acknowledged that distinctions between "commercial" and "noncommercial" activities are often problematic and may result in legal uncertainty in some cases.  *Id.* at 1633.  Nevertheless, this uncertainty is inherent in the federal system, and it is the duty of the courts to interpret the Constitution.

> The Constitution mandates this uncertainty by withholding from Congress a plenary police power that would authorize enactment of every type of legislation.  Congress has operated within this framework of legal uncertainty ever since this Court determined that it was the judiciary's duty "to say what the law is."  Any possible benefit from eliminating this "legal uncertainty" would be at the expense of the Constitution's system of enumerated powers.

*Id*. (citations omitted).  Accordingly, we cannot abdicate our duty to draw lines and enforce the outer limits of the Commerce Clause, even if this line-drawing occasions some legal uncertainty.

32

Fortunately, although it may be hard for courts to distinguish between "commercial" and "noncommercial" activities in some cases, this is not one of them. We need not invoke technical distinctions to determine whether child support payments constitute "commerce," as these payments do not share the essential characteristic of commerceSSthe relationship to trade and commercial intercourse. Mindful of the legal uncertainty inherent in the definition of "commerce," Justice Holmes once observed that "commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Swift & Co. v. United States*, 196 U.S. 375, 398 (1905). Child support payments are outside the "course of business" and cannot be defined as "commerce." Accordingly, even under a practical interpretation of "commerce," interstate child support payments cannot reasonably be classified as "things in interstate commerce."[21]

## C.

Having concluded that child support payments are not "things in interstate commerce" and do not "substantially affect" interstate commerce, I must consider the last possible ground for

---

[21] I am at a loss to understand the suggestion that the child support obligation *itself*, rather than the child support *payments*, might constitute a "thing in interstate commerce." While an intangible right, such as a commercial debt, may constitute the object of a commercial transaction, it is not a "thing" that "moves in interstate commerce." To suggest otherwise is to transform the Commerce Clause into an exercise in metaphysics.

Apparently, the majority means to suggest that the child support obligation is interstate commerce *per se* and is therefore a "thing in interstate commerce." This conclusion is belied, however, by the fact that child support payments are not "commerce." Accordingly, the child support obligation cannot be a "thing in interstate commerce."

33

regulation of child support payments under the Commerce Clause: use of the channels or instrumentalities of interstate commerce. The majority concludes that the CSRA constitutes a valid regulation of such "channels" and "instrumentalities" because the statute imposes criminal penalties only for the breach of *interstate* child support obligations.  I respectfully disagree.

The CSRA prohibits the willful failure to satisfy a child support obligation "with respect to a child who resides in another State."  18 U.S.C. § 228(a).  By its express terms, the statute regulates interstate *transactions*, not the *channels or instrumentalities* of interstate commerce.  There is no mention of commerce, nor is there a jurisdictional nexus to interstate commerce.  Accordingly, the statute effectively requires only diversity of citizenship among the parties, reducing what is often called the "Interstate Commerce Clause"[22] to nothing more than the "Interstate Clause."

The majority agrees that mere diversity of citizenship is not enough to authorize federal regulation under the Commerce Clause, noting that such a rule "would unwittingly open the floodgates to allowing Congress to regulate any and all activity it so desired, even those activities traditionally reserved for state regulation, so long as opposing parties are diverse."  This defect is cured, according to the majority, by the fact that the child support order "can be satisfied normally by a payment that necessarily must move

---

[22] *See*, *e.g.*, *Seminole Tribe v. Florida*, 116 S. Ct. 1114, 1125-27 (1996); *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 154 (1982).

in interstate commerce." Consequently, the majority concludes, interstate child support payments necessarily invoke the channels of, and flow in, interstate commerce. Not so.

Regardless of whether interstate child support payments will "normally" travel in interstate channels (as the majority assumes), the CSRA does not *require* the use of channels or instrumentalities of interstate commerce as a prerequisite to federal regulation. Unlike statutes that contain a jurisdictional nexus element "which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce," *Lopez*, 115 S. Ct. at 1631, the CSRA regulates *every* interstate obligation, without exception.

By its express terms, therefore, the CSRA does not regulate the use of the channels or instrumentalities of interstate commerce, but indiscriminately regulates *all* interstate child support payments. Accordingly, the CSRA does not constitute a permissible regulation of the channels of interstate commerce. *See United States v. Kirk*, 105 F.3d 997, 1008 (5th Cir. 1997) (en banc) (opinion of Jones, J.) (stating that the first *Lopez* category involves statutes that are distinguished by express jurisdictional nexus requirements).[23]

---

[23] The constitutional significance of the jurisdictional nexus requirement cannot be overstated. If an activity is commercial, the act of crossing state lines makes it interstate commerce *per se*, subject to direct federal regulation. In such cases, no express jurisdictional nexus must be included in the statute, because there is no need to establish the constitutional predicate for federal regulation. As I have noted, however, child support payments are not commercial, and hence are not subject to direct federal regulation.

If an activity is *not* commercial, the mere act of crossing state lines does not expose it to direct federal regulation, as it is not interstate commerce *per se*. In order to justify federal regulation of such non-commercial activity, Congress must provide an express jurisdictional nexus to interstate commerce. Such a jurisdictional nexus provides the sole constitutional foundation for

35

Because the CSRA does not include an express jurisdictional nexus requirement, but instead regulates *all* interstate child support payments, it is constitutional only if state borders are characterized as "channels" of interstate commerce, rendering all

---

federal regulation.

Hence, as *Lopez* demonstrates, Congress may regulate the use of the channels or instrumentalities of interstate commerce, or economic activities that "substantially affect" interstate commerce, in order to justify the regulation of activities that are not inherently commercial. The jurisdictional nexus is the source of this constitutional justification. *See*, *e.g.*, 18 U.S.C. § 1073 (prohibiting the use of the channels of interstate commerce by flight to avoid prosecution or the obligation to testify in court); 18 U.S.C. § 1201 (prohibiting the use of the channels of interstate commerce to transport an abductee across state lines); 18 U.S.C. §§ 2312-15 (prohibiting the shipment of stolen goods in interstate commerce); 18 U.S.C. § 1341 (prohibiting use of the mails to perpetrate fraud); *see also United States v. Orito*, 413 U.S. 139, 140 n.1 (1973) (noting that 18 U.S.C. § 1462 prohibits transportation of obscene material in interstate commerce); *Brooks v. United States*, 267 U.S. 432, 435 (1925) (noting that the National Motor Vehicle Theft Act prohibits the transportation of stolen vehicles in interstate commerce); *United States v. Hill*, 248 U.S. 420, 422 (1919) (noting that the Reed Amendment prohibits transportation of intoxicating liquor in interstate commerce); *Caminetti v. United States*, 242 U.S. 470, 491-92 (1917) (noting that the Mann Act prohibits the transportation of women in interstate commerce for immoral purposes); *Hoke v. United States*, 227 U.S. 308, 317-18 (1913) (same).

If a federal statute includes such an express jurisdictional nexus, providing a constitutional foundation for the act, the courts will not inquire into the motives underlying congressional regulation of non-commercial activity. "'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'" *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 256 (1964) (quoting *Caminetti*, 242 U.S. at 491); *accord United States v. Darby*, 312 U.S. 100, 114 (1941). In the absence of such an express jurisdictional element, however, Congress is not empowered to exercise a federal police power over non-commercial activities.

As I have explained, interstate child support payments are not "commerce," and are not subject to direct federal regulation as interstate commerce *per se*. Accordingly, the statute must require an express jurisdictional nexus to provide the constitutional basis for federal regulation of this non-commercial activity. It does not. The absence of an express jurisdictional nexus distinguishes the CSRA from valid regulations of the channels and instrumentalities of interstate commerce. Absent an express jurisdictional nexus, the CSRA is unconstitutional.

Finally, there is nothing in the present record to indicate whether any use of interstate channels or instrumentalities was either contemplated or required. In this regard, I very much question the panel majority's unusual statement that "Bailey made use of the interstate channels, as contemplated by the CSRA, the moment he moved away from Texas without fulfilling his child support obligation; he himself thereby placed the debt in the flow of interstate commerce." By this reasoning, any person moving to another state *ipso facto* federalizes all his financial obligations, and "utilizes" the channels of interstate commerce, merely by crossing a state line.

36

interstate activity subject to federal legislation.[24]  The majority is obligated to endorse this rationale, stating that "Bailey's obligation to send money across state lines immerses him in commerce among the several states."  This definition, however, pares the "Interstate Commerce Clause" to the "Interstate Clause," belying the claim that the CSRA is not solely a diversity statute. Such an interpretation of the Commerce Clause would grant Congress *carte blanche* to regulate all transactions among diverse parties, "opening the floodgates" to the creation of a federal police power.[25]

Furthermore, this court may not cure the constitutional defect in the CSRA by taking "judicial notice" that child support payments must necessarily travel in the channels of interstate commerce. There is nothing in the record to demonstrate that child support payments must *necessarily* use such channels, nor does the record demonstrate that the child support order in the instant case

---

[24] As stated above, only activities that are inherently commercial may be regulated solely on the basis that the subject of federal regulation has crossed state lines, rendering it interstate commerce *per se*. Non-commercial activities, such as child support payments, are subject to federal regulation only if they use a channel or instrumentality of interstate commerce, or "substantially affect" interstate commerce.  Absent a jurisdictional nexus, therefore, the CSRA is constitutional only if we assume that state borders are, by definition, "channels" of interstate commerce.  This expansive interpretation would effectively nullify the phrase "channels of interstate commerce," however, which necessarily implies something less than state borders, and would expose all interstate activity to a federal police power.

[25] Although it traces its lineage to cases such as *Champion v. Ames*, 188 U.S. 321 (1903) (upholding the constitutionality of the Lottery Act, basing the power to prohibit the interstate sale of lottery tickets on the purpose, i.e., to proscribe evil conduct), the notion of a Commerce Clause-based federal police power gained full steam in *Perez v. United States*, 402 U.S. 146 (1971), which upheld application of a federal anti-loan-shark statute to local activities without any showing of an interstate nexus or effect.  This jurisprudence unfortunately blurred the distinction between regulating commerce and exercising the police power to eliminate "evils" that threaten the general welfare, i.e., the distinction between a regulatory offense and creating a "true" crime.

*required* Mr. Bailey to use them. To assume that interstate child support payments must *necessarily* utilize the channels or instrumentalities of interstate commerce is to beg the question, abdicating the judicial obligation to enforce the outer limits of the Commerce Clause. *See Lopez*, 115 S. Ct. at 1633.

Although we strive to interpret statutes in order to avoid an unconstitutional construction, it is also true that this canon of construction is "'not a license for the judiciary to rewrite language enacted by the legislature.'" *Chapman v. United States*, 500 U.S. 453, 464 (1991) (quoting *United States v. Monsanto*, 491 U.S. 600, 611 (1989)). The CSRA does not regulate the channels or instrumentalities of interstate commerce, and therefore it exceeds the Commerce Clause. This court may not cure the constitutional defect by assuming the necessary relationship to interstate commerce and thereby abdicating its constitutional duty.

The CSRA is redolent of a police power, not a responsible and reflective exercise of legislative authority appropriate to a government of enumerated powers. Accordingly, the CSRA is not a constitutional exercise of the commerce power. To uphold the CSRA, "a purely criminal law, with no nexus to interstate commerce, whose enforcement intrudes upon traditional police powers of the states, would convert the commerce power into a reserved 'general federal police power.'" *Kirk*, 105 F.3d at 1016 (opinion of Jones, J.).[26]

---

[26] Because I conclude that the absence of a jurisdictional nexus fatally undermines the constitutionality of the CSRA, I do not reach the question whether Congress is empowered to regulate the *failure* to engage in interstate commerce. Nevertheless, I must express my misgivings about this creative interpretation of the Commerce Clause.

II.

The CSRA contains no express jurisdictional nexus requirement, regulates an activity that is not commercial, and invades the field of family law, a traditional area of exclusive state sovereignty. Therefore, with the revival of federalism as a constitutional value in *Lopez*, I conclude that the statute cannot survive constitutional scrutiny. So, I respectfully dissent from the diligent efforts of the panel majority to confront this difficult issue of constitutional interpretation.

---

It is counterintuitive to suppose that by empowering Congress "to regulate commerce . . . among the several states," the framers of the Constitution envisioned federal criminal prosecutions for the *failure* to utilize an interstate instrumentality, i.e., the failure to send a support payment (whether through the mails or by some other interstate means), as a valid regulation of the use of the channels of interstate commerce. This interpretation turns the original understanding of the Commerce Clause on its head.

Furthermore, the cases cited by the majority do not support the proposition that Congress is authorized to regulate the *failure* to use channels of interstate commerce. Upon close inspection, each case holds that Congress may regulate the *active* obstruction of interstate commerce and interference with the flow of interstate commerce. Such protective legislation is fundamentally different from the more radical proposition that Congress is empowered to regulate the *passive* failure of individuals to engage in interstate commerce. *See*, *e.g.*, *Heart of Atlanta Motel,* 379 U.S. at 253 (upholding the Civil Rights Act of 1964 because Congress may prohibit racial discrimination that obstructs the flow of interstate commerce); *United States v. Green*, 350 U.S. 415, 420 (1956) (upholding the Hobbs Act because Congress may prohibit violent actions that interfere with interstate commerce); *Standard Oil Co. v. United States*, 221 U.S. 1, 68 (1911) (upholding the Sherman Act because Congress may prohibit restraints of trade that obstruct interstate commerce).

Finally, insofar as these protective statutes regulate activities that obstruct the flow of interstate commerce, they are properly classified under the third prong of *Lopez*, which permits Congress to regulate economic activities that "substantially affect" interstate commerce. While the obstruction of interstate commerce is not a "use" of the channels of interstate commerce, under the common meaning of "use," such interference does exert a "substantial effect" on commerce. I have already explained, however, that the CSRA cannot be upheld as an activity that "substantially affects" interstate commerce, and the majority makes no effort to defend the act under this theory. Accordingly, the cases cited by the majority do not demonstrate that Congress is empowered to regulate the *failure* to use channels of interstate commerce.

39